UNITED STATES, Appellee,

v.

Theressie JONES, Senior Airman, U.S. Air Force, Appellant.

No. 58,419.
ACM 25904.

U.S. Court of Military Appeals.

Argued June 13, 1990.

Decided Sept. 26, 1990.

For Appellant: *Captain Michael C. Barrett*, USAFR (argued); *Colonel Richard F. O'Hair, Colonel Leo L. Sergi, Lieutenant Colonel Patrick C. Sweeney, Captain Paul M. Dankovich* (on briefs); *Colonel Fred W. Kuhn.*

For Appellee: *Captain Morris D. Davis* (argued); *Colonel Joe R. Lamport, Colonel Robert E. Giovagnoni, Captain Marc Van Nuys* (on brief).

*Opinion of the Court*

SULLIVAN, Judge:

On December 18, 1986, appellant was tried by a general court-martial composed of officer members at Clark Air Base, Republic of the Philippines. Pursuant to her pleas, she was found guilty of 5 specifications of violating a lawful general regulation, in contravention of Article 92, Uniform Code of Military Justice, 10 USC § 892.[1] She was sentenced to a bad-con-

---

1. One specification alleged importing a tax-exempt motor vehicle in violation of a local com-

duct discharge, confinement and forfeiture of $339.00 pay per month for 1 year, and reduction to the lowest enlisted grade. The convening authority approved the sentence as adjudged. The Court of Military Review affirmed the findings and sentence in an unpublished opinion dated June 18, 1987.

This Court set aside the findings and sentence and remanded the case for further review (26 MJ 165 (1988) (summary disposition)) in light of this Court's opinion in *United States v. Lee*, 25 MJ 457 (CMA 1988). Upon further review, the Court of Military Review again affirmed the findings and sentence. 26 MJ 632 (1988). This Court for a second time set aside the decision below and returned the record of trial for further review (28 MJ 94 (1989) (summary disposition)) in light of this Court's opinion in *United States v. Hilton*, 27 MJ 323 (CMA 1989). Upon further review, the Court of Military Review for the third time

affirmed the findings and sentence. 30 MJ 728 (1990).

■ This Court has now granted review of the following issue:

WHETHER THE PROVISIONS OF THE GENERAL REGULATION, US-CINCPACREPPHILINST 4066.7[R], PARAGRAPH 3h, ENCLOSURE (6), DATED 4 APRIL 1986, WHICH IMPOSES CRIMINAL LIABILITY FOR FAILURE TO ACCOUNT FOR A TAX EXEMPT MOTOR VEHICLE VIOLATES THE ACCUSED'S RIGHTS AGAINST SELF-INCRIMINATION IN VIOLATION OF THE FIFTH AMENDMENT AND ARTICLE 31, UNIFORM CODE OF MILITARY JUSTICE.

We hold that the above regulation [2] was applied to appellant, a person then suspected of a crime, in violation of her constitutional rights under the Fifth Amendment and her codal rights under Article 31(b),

mand regulation. The other four specifications alleged failure to show possession or authorized disposition of a tax-exempt motor vehicle in violation of this same local command instruction.

2. Paragraphs 3 and 4, United States Commander In Chief Pacific Republic of Philippines Instruction 4066.7R, Enclosure (6) (4 April 1986), state in pertinent part:

3. *Tax–Exempt Motor Vehicles.* The following acts and practices relating to the acquisition, possession, and disposition of motor vehicle are prohibited:

a. Disposal or sale of tax-exempt motor vehicles without prior written approval of the cognizant MCA [Merchandise Control Activity].

b. The sale of tax-exempt motor vehicles other than by completing the transaction, including the execution and transfer of documents evidencing title or ownership and acceptance of consideration, at the cognizant Merchandise Control Activity.

c. The sale of tax-exempt motor vehicle other than in accordance with enclosure (5) of this instruction.

d. The loan, mortgage, bailment, assignment, or similar transfers of a tax-exempt motor vehicle which permits actual use or possession of such exempt motor vehicle by a nontax-exempt person even though the legal title remains in a tax-exempt transferor.

e. The use of a power of attorney to enable a person to dispose of a motor vehicle thor-

ough an agent, except in cases of hospitalization or hardship as determined to exist by the MCO [Merchandise Control Office].

f. Importation into or purchase in the RP of tax-exempt motor vehicles primarily for the purpose of sale, exchange, barter, or disposition to any person or entity, or for any purpose other than to meet reasonable anticipated needs of the owner.

g. Uttering or submitting to the cognizant MCO a false report of loss, theft, destruction, or other disposition of a motor vehicle.

h. Failure to show possession or authorized disposition of tax-exempt motor vehicles when so directed by cognizant authorities.

i. The importation, or attempted importation, of more than one tax exempt motor vehicle into the RP except as authorized by this instruction.

4. *Sales of tax-paid personal property and motor vehicles originally imported by the owner pursuant to PCS orders or other similar authority.* Personal property and/or motor vehicles imported into the RP by Philippine citizen members of the U.S. military and which require payment of full Philippine taxes/duties may be sold to non tax-exempt personnel *only within 3 months of the member's* PCS departure from the RP. The sale must be approved by the cognizant MCO with the Deed of Sale accomplished by the MCO. The tax-paid personal property and/or motor vehicle must remain in the possession of the military member or his authorized dependents prior to the approved sale of the items.

Uniform Code of Military Justice, 10 USC § 831(b). *See United States v. Lee, supra; United States v. Lavine,* 13 MJ 150 (CMA 1982); *cf. United States v. Williams,* 29 MJ 112 (CMA 1989).

The court below stated the following in their opinion:

> From the record and allied papers we discern the following facts. The Air Force Office of Special Investigations (OSI) discovered a scheme whereby Air Force members would sign paperwork necessary to import a new vehicle into the RP [Republic of the Philippines] tax free. Upon arrival the vehicles would be turned over to local nationals not entitled to tax-free privileges. Used vehicles were also being blackmarketed. About 35 servicemembers were identified as being involved, Airman Jones apparently being one of them. An investigation was opened against her based upon documentation showing that in October 1985 she had imported a 1985 Mitsubishi Mini–Bus into the RP (subject of the specification amended at trial ... ). *On 9 January 1986, OSI agents met with her and asked her to account for that vehicle.* She could not. The only statement she made was that she had never received the vehicle. Further investigation revealed documentation that two individuals with tax-free privileges who worked at the American Embassy in Manila had sold vehicles to Airman Jones. Both sellers were interviewed and confirmed the transactions. *On 9 May 1986, OSI agents asked her to account for these two vehicles,* a 1981 Mitsubishi Galant Sigma and a 1982 Mitsubishi Galant Sapporo (subject of the second and third specifications under the Charge). Again, she could not. When asked to account, the only statement she made was "I don't know what you're talking about." She said nothing else due to the fact that the agents did not advise her of her rights and because she felt harassed by the way they had approached her. Within a couple of months, her involvement with two additional vehicles was confirmed, a 1984 Dodge Caravan Wagon and a 1983 Datsun Sentra Wagon (subject of the fourth and fifth specifications under the Charge). *At OSI's request, she was contacted by an official from the Clark Air Base Merchandise Control Office on 2 July 1986 and asked to account for these two vehicles.* She could not account for the 1984 Dodge. In response to questions without a rights advisement, she related that the 1983 Datsun Wagon had been shipped back to the United States. When asked for the shipping documents, she said they had been mailed to the person to whom she had shipped the car. The merchandise control official asked her to contact that individual and have the documents returned to her. She was instructed to bring them to him when she got them. She never did.

[ ]

> It is clear to us that these facts indicate Airman Jones was a suspect at the time of each "show and tell" conducted in this case. Nevertheless, we believe the accountability provision of the regulation charged as violated can be applied constitutionally to her.

30 MJ at 730–31 (emphasis added).

Appellant's guilty-plea inquiry at trial established that she was told by military investigators on May 9, 1986, that *"You purchased these vehicles,* and *we want you to tell us or show us where the vehicles are."* (Emphasis added.)[3] Similarly, when the

---

**3.** MJ: Was this a tax-exempt motor vehicle? In the second specification?
ACC: Yes, sir.
MJ: And you, in fact, purchased it, is that right?
ACC: Yes, sir.
MJ: When the OSI came, was it the OSI who came and asked you, apparently it was a Special Agent Speechley? Is he of the OSI?
ACC: Yes sir.
MJ: And you recognized Agent Speechley and Agent Waller as cognizant authorities under the regulations, do you think that's a fair description of their status?
ACC: Yes, sir.
MJ: When he asked you to show possession of this tax-exempt car, I take it you could

merchandise control official, Technical Sergeant Frasier, spoke to appellant regarding two vehicles, *"[H]e said if I didn't have the vehicle to show to tell him how I disposed of the vehicle."* (Emphasis added.)

---

The Court of Military Review has misconstrued the decisions of this Court in *United States v. Williams* and *United States v. Lee*, both *supra*. Its confusion is reflected most clearly in the following statement in its opinion. "If one accepts the required records doctrine as providing a constitutional basis for a limited construction of the usual accountability provisions found in these merchandise control regulations, then whether or not an individual is a suspect at the time of the requested accounting is immaterial. *Wilson v. United States*, 221 U.S. 361, 382, 31 S.Ct. 538 [545], 55 L.Ed. 771 (1911) ...." Although this statement may be correct in the abstract (*see* 8 Wigmore, *Evidence* § 2259c.2 and .3 (McNaughton rev.1961)), the decision to resolve appellant's case on this basis was legal error.

Our initial problem with the approach of the Court of Military Review is its narrow reading of our decision in *United States v. Williams, supra*. Our approval (29 MJ at 116–17) of the "show and tell" regulation at issue in that case was not simply based on the "required record" exception (*see Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948)), or more

accurately, the "required report" exception to the Fifth Amendment privilege against self-incrimination. *See California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed. 2d 9 (1971). Instead, we said:

> In light of the above, we reject appellant's argument that his pleas were improvident and that the military judge should have recognized a potential Fifth Amendment or Article 31 defense in his case. *Here, the evidence of record does not show that appellant was a suspect at the time of questioning or* that he was asked questions which violated the Fifth Amendment or Article 31. *Cf. United States v. Lee, supra*. Accordingly, we find no error in the military judge's acceptance of appellant's pleas.

29 MJ at 117 (emphasis added). To the extent the court below ignored the suspect aspect of our holding in *United States v. Williams, supra*, or purports to overrule the same, its decision is legally erroneous. *See generally United States v. Jones*, 23 MJ 301, 302 (CMA 1987).

■ Our second problem with the opinion below is that it totally ignores Article 31 and our precedent applying this codal provision to similar show-and-tell type situations. For example, in *United States v. Dyjak*, 18 USCMA 81, 85, 39 CMR 81, 85 (1969), we signaled the inapplicability of the "required records" doctrine as an exception to Article 31 where a military suspect was not acting in a representative capacity. *See United States v. Haskins*, 11 USCMA 365, 369–70, 29 CMR 181, 185–

---

not because you had transferred it to this Mr. Lott?

ACC: Well, when I was contacted by him, I didn't say anything. I said I don't know what you're talking about.

MJ: But you didn't show him possession?

ACC: No.

MJ: And you didn't show him disposition of the car?

ACC: No.

MJ: You just simply said, "I don't know what you're talking about"? Why is it that you said that?

ACC: Well, basically because ... I don't know, maybe ... well, for one thing I felt like they didn't read me my rights so then I shouldn't say anything. And to me, they were more or less ... the indication I got

was that it was harassing me, the way that they came on about it.

MJ: So the reason you say that you didn't show them the car was because you believed you were relying on your rights or you were mad that they didn't ask you your rights, I'm not sure exactly what ... ?

ACC: I felt, well, I thought that they were supposed to read me my rights, too. *But when I went in there then they just said that, "You purchased these vehicles, and we want you to tell us or show us where the vehicles are."* But they never read me my rights so therefore I didn't want to say anything.

MJ: Does the same thing apply to the car in the third specification?

ACC: Yes, sir.

(Emphasis added.)

86 (1960). Thus, in *United States v. Kauffman,* 14 USCMA 283, 34 CMR 63 (1963), and *United States v. Smith,* 9 USCMA 240, 26 CMR 20 (1958), we declined to comment on a requirement for warnings under Article 31 in a required-report situation where self-incrimination was involved. *See also United States v. Sievers,* 29 MJ 72, 74 (CMA 1989). Finally, in *United States v. Lavine,* 13 MJ 150 (CMA 1982), we upheld a conviction for failing to account for a motor vehicle as required by an earlier version of the same regulation at issue in this case. However, we expressly noted that the servicemember questioned "did not become suspected of the crime until after he stated that he no longer had" the items in his possession. *Id.* at 151. Clearly, such precedent was not discarded in *United States v. Williams, supra.*

In any event, the broad assumption of the court below that the "required records" doctrine applied in this case was not justified. *See generally Bionic Auto Parts and Sales, Inc. v. Fahner,* 721 F.2d 1072, 1082–83 (7th Cir.1983). In *United States v. Williams, supra,* a precondition existed for application of this doctrine in that case. We said, "A limited construction of this language [of the disclosure provision] suggests that the servicemember must show physical possession of the item or possess some type of documentation or other papers showing lawful disposition if the item is no longer in his possession." *Id.* at 115. Here, however, there is a different regula-

tion, and we cannot construe it or, at least, the portion concerning motor vehicles so narrowly. There simply is no requirement for making or keeping personal records concerning the disposition of tax-exempt motor vehicles.[4] *Cf. Marchetti v. United States,* 390 U.S. 39, 57, 88 S.Ct. 697, 707, 19 L.Ed.2d 889 (1968). Accordingly, the asserted premise of the court below for ignoring appellant's suspect status[5] was erroneous. Art. 31. *See generally United States v. Loukas,* 29 MJ 385 (CMA 1990).

We finally note that this case was tried almost 3 years before our decision in *United States v. Williams, supra,* and over 15 months before our decision in *United States v. Lee, supra.* Moreover, the record of trial makes clear that appellant was asked to tell where the motor vehicles were and that she was not asked to produce records showing their proper disposition. *Cf. United States v. Williams, supra* at 117. These inquiries unquestionably sought a testimonial and incriminating response. *See Baltimore City Department of Social Services v. Bouknight,* — U.S. ——, 110 S.Ct. 900, 905, 107 L.Ed.2d 992 (1990). *Cf. Doe v. United States,* 487 U.S. 201, 214–19, 108 S.Ct. 2341, 2350–52, 101 L.Ed.2d 184 (1988). Accordingly, the privilege against self-incrimination was implicated in this case.

In *United States v. Lee, supra,* we noted the constitutional and statutory problems with regulations which might permit

---

4. The nature of the inquiry permitted by the regulation is one critical factor in determining whether the regulatory scheme qualifies as an exception to the Fifth Amendment privilege under the "required records" or "required reports" doctrine. *See* 8 Wigmore, *Evidence* § 2259c.2 (McNaughton rev.1961). Our decisions have recognized that there is a substantive difference between a regulatory program providing for production of documents maintained by a servicemember in accordance with regulations and one requiring undelineated oral reports at the request of military authorities or criminal investigators. *See California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971) (plurality opinion); 8 Wigmore, *supra* at § 2259d.

5. The regulatory scheme at issue in this case is not expressly directed at an inherently suspect

group. However, its enforcement mechanism permits unrestrained selective application of the show-and-tell provision by military police and their agents. *Cf. United States v. Haydel,* 649 F.2d 1152, 1159 (5th Cir.1981); *United States v. Jeffers,* 621 F.2d 221, 226 (5th Cir.1980). The reality before us in so many cases is that the record shows it was applied exclusively to criminal suspects. *United States v. Daskam,* 31 MJ 77 (CMA 1990). In this light, substantial questions also exist as to whether this scheme was aimed at an inherently suspect group, namely servicemembers suspected of blackmarketing. *See Bionic Auto Parts and Sales Inc. v. Fahner,* 721 F.2d 1072, 1082–83 (7th Cir.1983). *Cf. United States v. Dichne,* 612 F.2d 632, 639 (2d Cir. 1979), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980).

military criminal investigators or their agents to employ an administrative program as a subterfuge for the criminal investigation of servicemembers suspected of crimes. We said:

> In assessing the lawfulness of such a regulation, as applied to appellant, we note that such a regulation cannot be applied to appellant in derogation of his constitutional and statutory rights. *See United States v. Seay,* 1 MJ at [201] 203 [CMA 1975]. *See generally United States v. Hutchins,* 4 MJ 190, 192 (CMA 1978); *United States v. Johnson,* 1 MJ 101, 105 (CMA 1975). *More particularly, it is well established that if appellant was a suspect at the time of this inquiry, Article 31 precludes this regulation or orders purportedly based thereon from being used to compel him to incriminate himself.* United States v. Dupree, 24 MJ 319, 321 (CMA 1987); *United States v. Reed,* 24 MJ 80 (CMA 1987); *United States v. Lavine,* 13 MJ 150, 151 (CMA 1982); *United States v. Seay, supra.* Also, law enforcement personnel cannot use this regulatory program as a pretext for obtaining evidence of crimes in violation of appellant's Fifth Amendment rights. *See New York v. Burger,* 482 U.S. 691, 716–17 n. 27, 107 S.Ct. 2636, 2651 n. 27, 96 L.Ed.2d 601 (1987); *Maine v. Moulton,* 474 U.S. 159, 174–76, 106 S.Ct. 477, 486–87, 88 L.Ed.2d 481 (1985).

25 MJ at 460 (emphasis added). We adhere to this holding today. Where the scope of the administrative inquiry is not precisely delineated in the regulation and the record establishes clearly incriminating questions, we cannot sustain the criminal conviction of a suspect for a failure to respond. *See generally Baltimore City Department of Social Services v. Bouknight, supra* 110 S.Ct. at 908–09; *United States v. Lee, supra.* Such is appellant's case.

The decision of the United States Air Force Court of Military Review is reversed as to specifications 2, 3, 4, and 5 of the Charge and the sentence. The findings of guilty thereon are set aside and those spec-

ifications are dismissed. The sentence is set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing on sentence may be ordered for specification 1 of the Charge, if practicable. If such a rehearing is not deemed practicable, a sentence of no punishment is hereby affirmed.

Chief Judge EVERETT concurs.

COX, Judge (dissenting):

Does an airman who imports a vehicle into the Republic of the Philippines have to account for that vehicle? If you accept Judge Sullivan's approach, *only the good guys do.* If you accept Chief Judge Everett's approach, *nobody does.* United States v. Lee, 25 MJ 457, 464 (CMA 1988) (Everett, C.J., concurring).

Article 31, Uniform Code of Military Justice, 10 USC § 831, prohibits the coercion of confessions. The remedy for its violation is to exclude from evidence the illegal confession. There are no illegal confessions here. Indeed, there are no confessions at all—only guilty pleas; and, the regulation does not require anyone to confess. *Id.* at 465–70 (Cox, J., concurring in part and dissenting in part).

To me, the primary question is whether the United States can regulate servicemembers' importation of goods into a foreign country. Secondarily, as part of the regulatory scheme, can the United States require members to be accountable for the goods thus imported? If the United States can require accountability, how does it offend the Fifth Amendment to the Constitution or Article 31 of the Code if it prosecutes those who cannot or will not be accountable, regardless of their reason?

My views are set forth in *United States v. Lee, supra.* In my judgment, the Court of Military Review is right on the mark with its construction of the law of "required records." Any other construction shoots the doctrine right in the heart and kills it dead as a doornail.

In *every instance,* the "required records" doctrine is only contested by per-

sons who will incriminate themselves by obeying the law. Under the majority approach, suspected criminals cannot be prosecuted for failing to keep records; only law-abiding citizens can. Thus, a pharmacist could not be prosecuted for failing to keep records of narcotic-drug distributions if he was suspected of illegally distributing them; but the pharmacist who legally distributes drugs under the same circumstances could be prosecuted if he fails to account for those distributions. "Required records" are tested for the legitimacy of the public interest in demanding accounta-bility. The fact that a person might incriminate himself by providing the information does not relieve that person of his *duty* to account. *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed. 2d 9 (1971).

What is obviously sticking in the majority's craw is that the police who are investigating these offenses are not warning servicemembers of their rights under Article 31(b). I share that concern. *United States v. Lee, supra* at 470. However, we do not need to throw the baby out with the bath water* to protect the legitimate rights of our servicemembers.

* Emptying the baby out with the bath. (Das Kind mit dem Bade ausschutten.)
    UNKNOWN [author]. A German proverb. Many young men today throw out the baby with the bath water.
    C.E.M. JOAD *London Observer, Sayings of the Week.*

    We are apt to make the usual blunder of emptying the baby out with the bath.
    BERNARD SHAW, *Parents and Children.* (1914)
*The MacMillan Book of Proverbs, Maxims, and Famous Phrases* 112 (Selected and Arranged by B. Stevenson, 1965).