UNITED STATES, Appellee,

v.

John L. GOOD, Staff Sergeant, U.S. Army, Appellant.

No. 64,302.

CM 8801024.

U.S. Court of Military Appeals.

Argued Oct. 4, 1990.

Decided Feb. 13, 1991.

For Appellant: *Captain Robin N. Swope* (argued); *Lieutenant Colonel Russell S. Estey and Captain Alan M. Boyd* (on brief); *Colonel Robert B. Kirby.*

For Appellee: *Captain Gary A. Khalil* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Major Martin D. Carpenter* (on brief).

*Opinion*

SULLIVAN, Chief Judge:

In the spring of 1988, appellant was tried by a special court-martial composed of officer members at Fort Sill, Oklahoma. Contrary to his pleas, he was found guilty of two specifications of larceny, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. He was sentenced to a bad-conduct discharge, confinement for 30 days, and reduction to the lowest enlisted pay grade. The convening authority approved this sentence. On November 28, 1989, the Court of Military Review affirmed the findings of guilty and the sentence in an unpublished opinion.

This Court granted review on the following question of law:

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY DENYING APPELLANT'S MOTION TO SUPPRESS STATEMENTS APPELLANT MADE TO HIS SUPERVISOR WHEN HIS SUPERVISOR FAILED TO APPRISE APPELLANT OF HIS UNIFORM CODE OF MILITARY JUSTICE ARTICLE 31 RIGHTS WHEN THE SUPERVISOR QUESTIONED APPELLANT ABOUT THE MISSING GOVERNMENT CHECK (THE OBJECT OF THE LARCENY ALLEGED IN SPECIFICATION 1 OF CHARGE I).

We hold that the military judge partially erred by refusing to suppress appellant's responses to his supervisor's questions in the department store parking lot on October 1, 1987. *Cf. United States v. Loukas,* 29 MJ 385 (CMA 1990). Moreover, we conclude that a remand to the court below is appropriate to initially determine whether such error was prejudicial. *See generally United States v. Steward,* 31 MJ 259 (CMA 1990).

The facts pertaining to the granted issue can be found in the special findings of the military judge below. He ruled:

MJ: All right, the purpose of this [Article] 39(a) [, UCMJ, 10 USC § 839(a),] session is to announce the results of the motion to suppress which was litigated the other day. Defense has moved to suppress unwarned statements made by Staff Sergeant Good to Special Agent Taylor on 21 September and 1 October 1987, on the ground that Special Agent Taylor should have warned Sergeant Good of his rights under Article 31 of the Uniform Code of Military Justice, [10 USC § 831,] prior to any questioning of Sergeant Good about the whereabouts of some civilian paychecks. Resolution of this matter turns on whether Staff Sergeant Good was a suspect within the meaning of Article 31 of the Code at the time he was questioned and thereby entitled to an appropriate rights warning. The test for making this determination is objective in nature; that is whether the interrogating official, Special Agent Taylor, believed or reasonably should have believed that Staff Sergeant Good committed an offense. The following facts are noted: Staff Sergeant Good was a military policeman working in a covert role as a civilian truck driver for the Army at Red River Army Depot, Texarkana, Texas; as part of this operation he was paid for his civilian employment with a civilian payroll check approximately every two weeks; he was instructed that he was to retain these payroll checks in a lock box in a safe house, located in a civilian motel in Texarkana. At the conclusion of the covert operation these civilian payroll checks were to be turned back to Army finance. Prior to and during the course of this covert operation, Staff Sergeant Good was described as having extreme personal financial problems apparently as the result of a recent divorce. Prior to questioning Staff Sergeant Good on 21 September, Special Agent Taylor was aware from phone calls and letters that Staff Sergeant Good's fiancee was having problems paying some bills,

that the district attorney from Lawton, Oklahoma, was inquiring about $300.00 to $400.00 in bad checks written on a closed bank account, and a bank was wanting to suppress—or repossess Staff Sergeant Good's motorcycle and a van apparently owned by Staff Sergeant Good had recently been repossessed. Special Agent Taylor's purpose in asking about the whereabouts of the civilian payroll checks was that he thought that these checks might tempt Staff Sergeant Good. By 21 September, Staff Sergeant Good should have had in his possession two payroll checks. One issued on 29 August and one issued on 12 September. On 21 September Special Agent [Taylor] asked, at a meeting at the safe house, Sergeant Good to surrender the checks he had received to that date. Staff Sergeant Good stated that they were in his apartment and that he would bring them to the next meeting with Special Agent Taylor on 1 October. On 1 October while waiting for Staff Sergeant Good to show up for their meeting, Special Agent Taylor made a search of the safe house and found two checks, one dated 29 August and one dated 28 September. He could not locate the 12 September check. When Staff Sergeant Good arrived at the safe house Special Agent Taylor asked about the checks and Sergeant Good stated that one was in the lock box but he could not locate the remaining checks. At Special Agent Taylor's suggestion, Sergeant Good searched the motel room and ultimately located the 28 September payroll check. He again stated he did not know where the 12 September check was and he suggested he would have to look in his apartment. When Sergeant Good returned for a meeting later that evening in a Montgomery Ward parking lot he stated he could not locate the check. He also stated he might have inadvertently thrown it out with some advertisements or that he may have inadvertently deposited it in his credit un-

ion account with some other checks. Special Agent Taylor has also described Sergeant Good as scatter brained and that he kept the safe house in a sloppy condition. Special Agent Taylor also testified that he thought that Staff Sergeant Good had either lost or misplaced the check and that it was only after his last meeting in the parking lot with Sergeant Good on 1 October that he thought Sergeant Good was a suspect. Special Agent Taylor as Staff Sergeant Good's supervisor and controller for the covert operation had a duty to insure that the covert operation was being conducted according to the operational plan. By the same token, Staff Sergeant Good had a positive duty to account for the civilian checks which he'd received and which were committed to his care in accordance with the covert operation plan. Staff Sergeant Good had been a military policeman for some time and there was nothing of significance to suggest that he had ever previously defaulted in the care and custody of government funds. Thus, there was nothing to indicate or warn Special Agent Taylor that he should treat Sergeant Good as other than a fellow military policeman and not as a suspect of a criminal offense such as larceny or wrongful appropriation. Under the circumstances of this case, I do not view Special Agent Taylor as a very suspicious person, but as a fair minded individual who would not be obliged at the time he asked about the whereabouts of the paychecks to have treated Staff Sergeant Good as a suspect. Moreover, I do not view Sergeant Good's personal financial problems or the fact that Special Agent Taylor thought the checks might be a temptation to Sergeant Good as indicating suspicion on Special Agent Taylor's part. As the facts indicate the safe house was in a very sloppy condition and Sergeant Good was described as somewhat flighty or scatter brained. There were several innocent explanations of the locations of the checks in question and Special Agent Taylor undoubtedly intended his inquiry to elicit an answer which did not evidence wrongdoing on the part of Sergeant Taylor—or excuse me Sergeant Good. While it may be argued that the statements obtained in the Montgomery Ward parking lot would have caused Special Agent Taylor to interrupt them and require an Article 31 warning at that point, I find that Sergeant Good's statement at that point, which may be viewed as both exculpatory and somewhat inculpatory did not demand of Special Agent Taylor a degree of perception such as the listener must assess the nature of a statement before its completion. Considering the posture of the questioning of Staff Sergeant Good by Special Agent Taylor on 21 September and 1 October, I perceive no justifiable basis for suspecting Sergeant Good of any offense. At best, after the questioning about the location of the 12 September payroll check, which took place in the Montgomery Ward parking lot, that is the occasion which appears to be the earliest time when suspicion would logically have begun to focus on Sergeant Good concerning the offenses in question. Accordingly, the motion to suppress is denied. Any questions?

TC: None, Your Honor. Would you object if we provided a written copy of that to the counsel if she so requests?

MJ: I have no problems with that, of course, it's going to be typed in the record verbatim and I probably read it 99 percent verbatim, but edited as I was reading it also, but, I'll—I have no problem with providing Captain McDevitt [defense counsel] with a copy of this if she wants it.

DC: Sir, does that include that Sergeant Good was not a suspect in the Montgomery Ward parking lot?

MJ: Not until after the completion of the conversation.

DC: All right, sir.

Not all questioning of a servicemember by his military superior need be preceded by Article 31 warnings. The servicemember is entitled to this rights advice only if he is a suspect at the time of the questioning and the questioning itself is part of an official law-enforcement investigation or disciplinary inquiry. *See United States v. Loukas, supra.* However, any questioning of a suspect by a military superior in his immediate chain of command will normally be presumed to be for disciplinary purposes. *Id.* at 389 n.

A servicemember's status as a suspect and the nature of the official[1] inquiry as either law enforcement or disciplinary are ultimately legal questions. The former is answered by considering all the facts and circumstances at the time of the interview to determine whether the military questioner believed or reasonably should have believed that the servicemember questioned committed an offense. *United States v. Graham,* 21 USCMA 489, 45 CMR 263 (1972); *United States v. Henry,* 21 USCMA 98, 44 CMR 152 (1971); *United States v. Anglin,* 18 USCMA 520, 523–24, 40 CMR 232, 235–36 (1969); *see generally United States v. Ravenel,* 26 MJ 344, 346 (CMA 1988) (Everett, C.J.); D. Schlueter, *Military Criminal Justice: Practice and Procedure* § 5–2(B) at 166 n. 45 (1982) (and cases cited therein). The latter is determined by assessing all the facts and circumstances at the time of the interview to determine whether the military questioner was acting or could reasonably be considered to be acting in an official law-enforcement or disciplinary capacity.[2] *United States v. Moore,* 32 MJ 56 (CMA 1991); *United States v. Jones,* 31 MJ 189 (CMA 1990); *United States v. Loukas, supra; United States v. Beck,* 15 USCMA 333,

339, 35 CMR 305, 311 (1965). When the questioning is done by a military supervisor in the suspect's chain of command, the Government must additionally rebut a strong presumption that such questioning was done for disciplinary purposes. *See United States v. Loukas, supra* at 389.

Turning to the case at bar, we must first consider appellant's questioning by Special Agent Taylor on September 21, 1987. We note that the record does not establish that the agent believed or reasonably should have believed that appellant had committed a crime at that time. Agent Taylor had not been formally notified by either the bank or government authorities that the check had been negotiated. Moreover, prior to this questioning, appellant had neither failed to produce the check upon demand nor provided any excuse for failing to maintain it as required in the lock box. While appellant's financial problems reasonably suggest that preventive measures by his supervisor were warranted, they did not by themselves reasonably suggest that appellant had already committed a crime. In sum, no warnings were required at this time because appellant did not meet the suspect prong of Article 31. *Cf. United States v. Lee,* 25 MJ 457 (CMA 1988).

The questioning of appellant on October 1, 1987, however, is a somewhat different matter. On that date Special Agent Taylor had reason to believe that appellant committed a crime, at least by the time of their second meeting in the department store parking lot. *Id.*

Several factual circumstances dictate this legal conclusion. First of all, the agent had been informed by appellant on September 21, 1987, that he did not store the check in the lock box at the safe house, as re-

---

**1.** *But see* H. Moyer, *Justice and The Military* § 2–206: *Informers and Undercover Agents* at 326–28 (1972), and cases cited therein.

**2.** A purely subjective test in part has been suggested by various judges of this Court over the years. *See United States v. Duga,* 10 MJ 206, 210 n. 6 and 211 n. 7 (CMA 1981). However, the better approach is that of "a reasonable man in the suspect's position." This test was utilized

by the Supreme Court in *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984), to determine when custodial interrogation has occurred for purposes of "*Miranda*" *v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), warnings. *See also Illinois v. Perkins,* —— U.S. ——, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990); *Pennsylvania v. Bruder,* 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988).

quired by the rules of the undercover operation, but at his apartment. Second, Agent Taylor also knew that appellant had promised on that date to produce this check at the safe house on October 1, 1987. Third, the agent personally searched the safehouse motel room on October 1, 1987, when appellant was 3 hours late for their agreed-to meeting. He knew it held only two of the three missing checks. Fourth, Agent Taylor was fully aware that appellant did not produce the check at their first meeting on October 1, 1987, as appellant had previously promised. Fifth, he knew that appellant had again failed to produce the check at their second meeting on that same date as directed. Sixth, Agent Taylor was fully informed of appellant's substantial financial problems and possible misconduct. Finally, Agent Taylor, himself, admitted his suspicion in his testimony on this motion. He said, "The thought [appellant had committed some offense] occurred to me when we were in the hotel room. That's really when it first occurred to me that he may have taken the check. It was a solid suspicion by the time he gave me these two stories about yellow envelopes and mistakenly making deposits ..." *See generally United States v. Schake*, 30 MJ 314, 317 n.2 (CMA 1990). In view of the above, it is clear that he should have reasonably suspected appellant of committing the offense of larceny or dereliction of duty prior to his further questioning of appellant in the parking lot on October 1, 1987.

An additional issue we must confront is whether Agent Taylor's later questioning of appellant on October 1, 1987, was in an official law-enforcement or disciplinary capacity. The Government suggests such questioning was a legitimate administrative inquiry pertinent to an ongoing undercover operation. However, we note that Agent Taylor was appellant's military superior and in his immediate chain of command. *See United States v. Loukas, supra* at 389 n. He was also a military criminal investigator whose duty was to investigate crimes. In addition, we note that the immediate location of the check was not shown to be a necessary requirement for the completion of this undercover operation. *Id.* Finally, Agent Taylor himself admitted that he "should have read him his rights" on October 1, 1987, at least for his questioning in the parking lot. In the above context, this questioning by Agent Taylor could only be considered to be in an official law-enforcement or disciplinary capacity such that Article 31(b) warnings were required. *Cf. United States v. Moore* and *United States v. Loukas*, both *supra.*

The final question we must decide is whether prejudice resulted from the evidence admitted in violation of Article 31(d). We note that the single issue of importance at this court-martial with respect to the civilian-government-check specification was appellant's intent in cashing this check. Moreover, his defense at trial was that he honestly mistook this check for his military pay check and cashed it unintentionally. Finally, he had earlier stated on September 21, 1987, that he had the check at his apartment, and evidence of this statement, as noted above, was properly admitted in this case.

Appellant's initial admissible statement on October 1, 1987, concerning the location of the check in his apartment mirrors his earlier statement on September 27, 1987. Moreover, his later inadmissible statements in the parking lot that he lost the check or mistakenly cashed it generally support his trial testimony of mistake of fact. Nevertheless, an inference of guilt could be drawn from the somewhat different stories he provided on October 1, which might have prejudiced his defense. In view of these circumstances, we believe the Court of Military Review should have the opportunity to address the question of prejudice.

The decision of the United States Army Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Army for remand to that court for further review.

EVERETT, Senior Judge (concurring in the result):

I agree with Chief Judge Sullivan's application of the standard that he and Judge

Cox first announced in *United States v. Loukas*, 29 MJ 385 (CMA 1990), to the facts of this case. If I agreed with that standard, I could concur outright. Of course, I do not, *see id.* at 391 (Everett, C.J., *dissenting*). Nonetheless, my application here of what I view to be the strictures of Article 31, Uniform Code of Military Justice, 10 USC § 831, leads me to the same ultimate conclusion; so I concur in the result.

COX, Judge (dissenting):

I disagree with my Brothers on several grounds. First, I agree with the military judge that, prior to and during the parking lot conversation on October 1, 1987, appellant was "not ... a suspect of a criminal offense," within the meaning of Article 31(b), Uniform Code of Military Justice, 10 USC § 831(b). Thus, Agent Taylor was not required to advise appellant of his Article 31 rights.

Article 31(b) states:

No person subject to this chapter may interrogate, or request any statement from, an accused or a person *suspected of an offense* without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

(Emphasis added.)

As of October 1, 1987, Agent Taylor had absolutely no basis to suspect that a larceny or conversion of the paychecks had in fact occurred. Taylor knew only that appellant was short of cash and may have written some bad checks on a private checking account. On the other hand, appellant had already surrendered two of the three checks and had given Taylor a plausible explanation for the whereabouts of the third check. Certainly Taylor was pru-

dent in seeking to remove this final temptation from appellant; however, he could have had no basis to suspect, in the sense of Article 31(b), that the last check had already been converted.

Whether Taylor *subjectively* suspected appellant had committed an offense (as opposed to being merely cautious) is a pure question of fact. The military judge's findings in this regard, specifically affirmed by the Court of Military Review [unpub. op. (Nov. 28, 1989)], should be conclusive on this record: Taylor did not suspect appellant of having actually committed an offense.*

Whether Taylor *should have suspected* that appellant had committed an offense is, I take it, the "legal conclusion" my Brothers cite. I read these facts in total agreement with the military judge: absolutely the earliest moment Taylor should have suspected that appellant had converted the check was *after* the parking lot conversation on October 1, when appellant stated he could not find the check and may have either inadvertently thrown it away or deposited it. Even then, the explanation given was exculpatory, containing a denial of *mens rea*. Thus in my view, as a matter of law, appellant was not a suspect within the meaning of Article 31(b) on October 1, 1987, in the Montgomery Ward parking lot, when Taylor asked him for the check. Therefore, it was not until after appellant's response that Taylor was obligated to advise appellant of his Article 31(b) rights.

My reasoning for concluding that appellant was not a suspect is further buttressed by my understanding of the purpose of the contact between Taylor and appellant. In *United States v. Loukas*, 29 MJ 385 (CMA 1990), Chief Judge Sullivan and I set forth our views that the warning requirement of Article 31(b) was implicated only when the inquiry was a part of a law-enforcement or disciplinary investigation. 29 MJ at 387–89

---

* The military judge clearly understood the legal test to be applied to the facts, as follows:

The test for making this determination is objective in nature; that is whether the interrogating

official, Special Agent Taylor, believed or reasonably should have believed that Staff Sergeant Good committed an offense.

(Sullivan, J.); 390–91 (Cox, J., concurring). Here, although Taylor was a law-enforcement officer, so was appellant. Indeed, the communication between the two arose out of a law-enforcement operation in which both participated. Appellant was a temporary custodian of certain property. Taylor was the party to whom appellant had the duty to deliver the property. Taylor was seeking return of the property; he was not even asking for a statement. As I perceive the facts, Taylor was not investigating crime. Under Article 31(b) and *Loukas*, he had no duty to advise appellant of his rights.

Finally, I disagree with my Brothers as to the necessity of a remand. It is clear to me that, regardless of the foregoing, appellant was not prejudiced by admission of his October 1 statements. Appellant's defense at trial was that he had mistakenly cashed the check. There was no doubt that the check had been cashed and that appellant had cashed it. The only issue was his *mens rea*. All of appellant's pretrial statements, including that of October 1, were to the same effect—that whatever had become of the check, appellant had no intent wrongfully to convert it. The court-martial disbelieved that appellant mistakenly cashed the check. His statement on October 1 that he could not find it because either he had mistakenly thrown it out or mistakenly deposited it was entirely consistent with his lack of *mens rea* defense. Even if the statement should not have been admitted, appellant could not have been prejudiced. Art. 59(a), UCMJ, 10 USC § 859(a).

I would affirm the decision of the United States Army Court of Military Review.