UNITED STATES, Appellee,

v.

Specialist Angel D. DELVALLE, United
States Army, Appellant.

ARMY 9800126.

U.S. Army Court of Criminal Appeals.

16 July 2001.

For Appellant: Major Scott R. Morris, JA; Captain Blair T. O'Connor, JA (on brief).

For Appellee: Lieutenant Colonel Edith M. Rob, JA; Major Mary E. Braisted, JA (on brief).

Before CAIRNS, Senior Judge, BROWN, and VOWELL, Appellate Military Judges.

## OPINION OF THE COURT

VOWELL, Judge:*

A military judge sitting as a general court-martial convicted the appellant, contrary to his pleas, of conspiracy to commit larceny and burglary, larceny, and burglary, in violation of Articles 81, 121, and 129, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 921, and 929 [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to Private E1.[1]

In this Article 66, UCMJ, 10 U.S.C. § 866, appeal, the appellant contends that the military judge erred in admitting three of the appellant's pretrial statements in which he confessed to the charged offenses. He also argues that the staff judge advocate erred in forwarding to the convening authority a clemency request submitted on behalf of the appellant by his former defense counsel. Finally, the appellant alleges prejudice stemming from the dilatory post-trial processing of his case. All three issues warrant discus-

---

* Judge Vowell took final action in this case prior to her reassignment.

1. The military judge ordered one day of credit for restriction tantamount to confinement against the sentence to confinement, based on the one day the appellant spent in military police custody. As the appellant correctly notes in his personal submissions pursuant to *United States v.* *Grostefon*, 12 M.J. 431 (C.M.A.1982), the staff judge advocate neglected to advise the convening authority of the military judge's order, and the convening authority's action contains no mention of it. We will direct that the appellant receive this credit in our decretal paragraph. *See* Army Reg. 27–10, Legal Services: Military Justice, para. 5–28(a) (24 June 1996).

sion, but only the post-trial delay warrants relief.[2]

## I. THE CONFESSIONS

### A. Factual Background

The charges in this case stemmed from the larceny of a pistol and cellular telephone from the Fort Drum, New York, quarters of Sergeant (SGT) Miller sometime in the late evening hours of 1 August 1997. While SGT Miller and his family were away for the weekend, someone entered their quarters through a window screen.

Suspicion immediately fell on Corporal (CPL) Knaggs, the Miller's only neighbor in the quadruplex at that time. Sergeant Miller believed that CPL Knaggs was the only person outside his family to know that he owned the pistol. Sergeant Miller reported this fact to the military police investigator assigned to the case, SGT Daniels, who then picked up CPL Knaggs for questioning.

Unbeknownst to SGT Miller, CPL Knaggs had discussed SGT Miller's new laser-sighted pistol in a conversation on 31 July 1997 with several unit members, including the appellant. The appellant and his teen-aged nephew, "Freddy,"[3] came to CPL Knaggs' quarters the next evening. The appellant asked if the neighbor who owned the pistol was home. Corporal Knaggs indicated that his neighbor was out of town. The appellant remarked that the place would be easy to rob in that case. At the time, CPL Knaggs believed the appellant was joking, but was unsure if Freddy, who had joined in the conversation, was serious. After a few hours of watching television, CPL Knaggs fell asleep, and sometime thereafter the appellant and his nephew left.

The next morning, CPL Knaggs noticed his neighbor's screen had been cut. Suspecting that something criminal might have transpired, he approached the appellant in the unit area and asked if anything had hap-

pened the night before. The appellant responded that he and his nephew had "knocked off" CPL Knaggs' neighbor. Corporal Knaggs did not immediately report the appellant's admission.

When questioned by SGT Daniels on 5 August 1997, CPL Knaggs identified the appellant as a possible suspect. Accordingly, SGT Daniels apprehended the appellant and brought him to the military police (MP) station for questioning the following day. After receiving his Article 31(b), UCMJ, 10 U.S.C. § 831(b), rights advisement, the appellant asked to speak with an attorney, and questioning ceased. Later that day, the appellant, who had remained detained at the MP station, consented to the search of his quarters and vehicle. The ensuing search yielded no evidence of the crimes. After being released to his unit first sergeant, the appellant returned to his own quarters on the evening of 6 August 1997.

Thereafter, the appellant made oral and written statements to Sergeant First Class (SFC) Salisbury (his platoon sergeant), Captain (CPT) Zimmerman (his company commander), and SGT Daniels. In a pretrial motions hearing, the appellant challenged the admissibility of his inculpatory statements to these three individuals.

The military judge made extensive findings of fact before ruling that the appellant's statements to all three individuals were admissible. Using our Article 66(c), UCMJ, powers, we adopt those factual findings as our own. To aid in the legal discussion to follow, we briefly summarize the facts below.

### 1. Statements to SFC Salisbury

On 6 August 1997, when the appellant returned to his quarters after having invoked his right to counsel, he was aware that CPL Knaggs had implicated him in the burglary and larceny because CPL Knaggs had so informed him the previous day. Sometime between 2000 and 2030 hours on 6 August

---

**2.** We have considered the appellant's remaining submissions pursuant to *Grostefon* and have determined that they lack merit.

**3.** The appellant later testified that "Freddy" was his nephew's nickname. To avoid confusion, we will refer to the young man as "Freddy" in this

opinion. We also note some confusion over Freddy's relationship to the appellant. In his trial testimony, the appellant referred to Freddy as his nephew; in his confession, the appellant referred to Freddy as his cousin.

1997, the appellant contacted SFC Salisbury at home to seek his advice. At the appellant's request, SFC Salisbury went to the appellant's quarters. At the time, SFC Salisbury knew that the appellant had been apprehended by the military police and had invoked his Article 31(b), UCMJ, rights. As a unit representative, SFC Salisbury had observed the military police search the appellant's quarters and his vehicle earlier that day. Sergeant Salisbury also knew that CPL Knaggs had claimed that the appellant told him that he committed the burglary.

After inviting SFC Salisbury inside, the appellant asked him what he should do. Sergeant Salisbury responded, "It depends on whether you did it or not." The appellant then confessed his involvement. Thereafter, SFC Salisbury asked specific questions about the offenses and the possible involvement of other soldiers in the platoon. Sergeant Salisbury also advised the appellant what he could do to minimize the damage to his career, telling the appellant to "come clean" and to return the weapon. The final decision as to what to do was left in the appellant's hands. Sergeant Salisbury promised the appellant that he would do what he could to keep the disposition of the offenses at the lowest possible level. He did not promise any specific action on or disposition of the offenses.

Several weeks later, SFC Salisbury saw the appellant in the unit area and asked him if he had returned the stolen weapon. The appellant responded that he had not.

The military judge also made factual findings concerning SFC Salisbury's motivation and credibility, findings with which we concur. She found SFC Salisbury's testimony highly credible. She noted that SFC Salisbury did not disclose his conversations with the appellant to anyone for several months,[4] buttressing her conclusion that SFC Salisbury was not acting as an agent of law enforcement or the command in his questioning.

4. Sergeant Salisbury's conversations with the appellant came to light when SFC Salisbury asked a fellow parishioner, who was the brigade legal specialist, what was happening with regard to

### 2. Statements to CPT Zimmerman

The morning following his discussion with SFC Salisbury, the appellant approached CPT Zimmerman outside his office and asked to talk to him as part of his "open door" policy. Captain Zimmerman was aware that the appellant was a suspect in the burglary and larceny and that he had invoked his rights when questioned by SGT Daniels. He was not aware of the appellant's statements to SFC Salisbury. Captain Zimmerman asked the appellant to step into his office, and as CPT Zimmerman shut the door, the appellant spontaneously stated, "I did it, sir."

Captain Zimmerman stopped the appellant from saying anything else. He called the first sergeant into the office to witness CPT Zimmerman read the appellant his rights. After the appellant waived his rights, he made both oral and written statements confessing to the burglary and larceny.

### 3. Statements to SGT Daniels

After receiving the appellant's written statement, CPT Zimmerman contacted SGT Daniels and arranged to have the appellant transported to the MP station for further interrogation. Upon the appellant's arrival, SGT Daniels ascertained that the appellant had not yet seen a lawyer and asked the unit to take the appellant to the Trial Defense Service (TDS) office. The appellant returned to SGT Daniels' office in the early afternoon. He showed SGT Daniels the business card of the lawyer he had consulted at TDS, and indicated that he wanted to make a statement. The appellant explained that he was willing to discuss the offenses under investigation, but had been advised by his lawyer that he could stop the questioning at any time if he felt uncomfortable.

Sergeant Daniels readvised the appellant of his Article 31(b), UCMJ, rights, which the appellant waived. The appellant thereafter made a written statement indicating that he had assisted his "cousin," Freddy, in the burglary and larceny. The appellant said that Freddy had returned to New York City

the appellant. The legal specialist notified military authorities that SFC Salisbury had information of value to the investigation.

on the bus with the weapon the previous Sunday, and that he did not know the whereabouts of either Freddy or the weapon.

### B. Law and Analysis

#### 1. Standard of Review

█ Before a confession may be admitted, "the military judge must find by a preponderance of the evidence" that the confession is voluntary. Military Rule of Evidence 304(e)(1) [hereinafter Mil.R.Evid.] We review the military judge's legal conclusion that the appellant's statements were voluntary de novo. *See Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *United States v. Ford,* 51 M.J. 445, 451 (1999).

#### 2. Unwarned Statements to SFC Salisbury

█ In spite of the plain language of Article 31(b), UCMJ,[5] our superior court has long held that rights warnings are required only when the questioner is acting in an official capacity and the suspect reasonably perceives the questioning as official. *United States v. Duga,* 10 M.J. 206, 210 (C.M.A. 1981). Reasoning that Article 31, UCMJ, was enacted to ensure that coercion of rank or position of the questioner did not cause a suspect to make involuntary statements, the court focused on actual or apparent coercion, rather than mere disparity of rank or position. *Id.* at 209–210. The admissibility of the appellant's statements to SFC Salisbury thus turns on whether SFC Salisbury was acting in an "official" capacity and whether the appellant perceived SFC Salisbury's questioning as official in nature. *See United States v. Pownall,* 42 M.J. 682, 686 (Army Ct.Crim.App.1995) ("[W]hen suspects are questioned during an official law-enforcement investigation or disciplinary inquiry, Article 31, UCMJ, warnings are required."); Mil. R.Evid. 305(d).

In one sense, SFC Salisbury was clearly acting in an official capacity. He and the

appellant were not personal friends, and their conversation at the appellant's quarters was not a casual encounter. Sergeant Salisbury was there because he was the appellant's military superior. On the other hand, the appellant *asked* SFC Salisbury to come to his quarters. The appellant *asked* him for advice, both because he respected SFC Salisbury as a leader and because he knew that SFC Salisbury's opinion was highly regarded by the other leaders in the unit. The appellant believed that SFC Salisbury had the ability to influence CPT Zimmerman in his favor.

However, SFC Salisbury was not acting in a law enforcement or disciplinary capacity when he went to the appellant's quarters. He was there because one of his soldiers had asked for his help. When the appellant asked for his advice, SFC Salisbury responded that he needed to know if the appellant had done what was alleged in order to properly advise him. Like the military judge, we attach great weight to the fact that SFC Salisbury kept the fact of the appellant's confession to him secret for many months. And, like the military judge, we also attach great weight to the appellant's solicitation of SFC Salisbury's advice.

█ Questioning of a suspect by a military superior in his chain of command is normally presumed to be questioning for disciplinary purposes. *United States v. Good,* 32 M.J. 105, 108 (C.M.A. 1991). That presumption may be rebutted, based on the totality of the circumstances. *United States v. Pittman,* 36 M.J. 404, 407 (C.M.A. 1993). We find evidence sufficient to rebut that presumption in this case. Sergeant Salisbury's questioning took place in the appellant's home, at the appellant's invitation, and in response to the appellant's request for SFC Salisbury's advice. The appellant knew and understood his rights. He was not intimidated by authority; he had elected to remain silent throughout a day of incarceration at the MP station after

---

5. Article 31(b), UCMJ, provides:
 No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to

make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial. *See also* Mil.R.Evid. 305(c).

being properly advised of his Article 31(b), UCMJ, rights. The appellant knew that CPL Knaggs had implicated him to military authorities. The appellant's motivation in answering SFC Salisbury's questions had nothing to do with SFC Salisbury's overbearing the appellant's will or with the disparity of rank or position between SFC Salisbury and the appellant; it had everything to do with the appellant's desire to salvage his career in the face of the evidence against him. *See Good,* 32 M.J. at 108 (applying a totality of the circumstances test to determine if "the military questioner was acting or could reasonably be considered to be acting in an official law-enforcement or disciplinary capacity") (citations omitted).

We hold that the appellant's statements to SFC Salisbury on 6 August 1997 were freely and voluntarily made and were, therefore, properly admitted. Assuming, arguendo, that they were not admissible, we find any error in admitting them to be harmless beyond a reasonable doubt, as the subsequent oral and written confessions, coupled with the corroborating evidence, established the appellant's guilt beyond a reasonable doubt.[6]

### 3. *Derivative Evidence*

#### (a) Statements to CPT Zimmerman

The appellant's statements to CPT Zimmerman were made less than twelve hours after his unwarned statements to SFC Salisbury. The appellant contends that his statements to CPT Zimmerman were tainted by the earlier, unwarned disclosures. Assuming, arguendo, that the statements to SFC Salisbury were involuntary, we disagree that they tainted his subsequent admissions.

■ A statement challenged as derivative evidence may be admitted if the military judge determines that: (1) the statement was voluntary; (2) the evidence was not obtained by using the earlier statement; or (3) there is no causal connection between the two

statements. *Pownall,* 42 M.J. at 686 (citing Mil.R.Evid. 304(e)(3)). We determine the admissibility of the "derivative" statement based on the totality of the circumstances. *United States v. Ford,* 51 M.J. 445, 451 (1999). "Taint" from earlier, unwarned admissions is not presumed where there has been no actual coercion. *See United States v. Lichtenhan,* 40 M.J. 466, 470 (C.M.A.1994). We hold that the appellant's statements to CPT Zimmerman were voluntary and were not obtained by the use of his earlier statements to SFC Salisbury.

■ We can summarily dispose of the appellant's spontaneous statement to CPT Zimmerman that he "did it." *See Lichtenhan,* 40 M.J. at 469 (incriminating, spontaneous statements do not fall within the purview of Article 31, UCMJ). The appellant preceded his remark with a request to see the company commander under his "open door" policy. Prior to this spontaneous confession, CPT Zimmerman had no indication that the appellant wanted to discuss the offenses. We are satisfied that this utterance was freely and voluntarily made.

■ In considering the admissibility of the appellant's oral and written confessions to CPT Zimmerman, in addition to considering the factors in *Pownall,* 42 M.J. at 686, we look to the factors our court relied on in *United States v. McCaig,* 32 M.J. 751, 753 (A.C.M.R.1991): the time lapse between interrogations; whether rights warnings were administered again; whether the successive questionings were done by the same interrogator; whether cleansing warnings were given; whether subsequent interrogations used or made reference to the earlier admissions; whether the accused knew that his earlier statements could not be used; and whether illegal or unethical conduct caused the accused to let "the cat out of the bag."

6. The appellant's second statement to SFC Salisbury that he had not yet turned over the weapon was made in the context of a casual conversation, not an official interrogation. Sergeant Salisbury had provided the appellant with advice suggesting that returning the weapon would be favorably viewed by the chain of command. He simply wanted to see if the appellant had taken that advice. Again, assuming, arguendo, that the appellant's answer was not voluntary within the meaning of Mil.R.Evid. 304, we find its admission to be harmless beyond a reasonable doubt, in view of the appellant's subsequent spontaneous statement to his commander and the subsequent written confessions preceded by Article 31(b), UCMJ, rights advisements.

 In this case, CPT Zimmerman properly administered Article 31(b), UCMJ, warnings immediately after the appellant spontaneously confessed.[7] While the appellant's decision to talk with CPT Zimmerman was at least partially influenced by his conversation the evening before with SFC Salisbury, CPT Zimmerman was unaware of that earlier conversation. There is no evidence that SFC Salisbury compelled the appellant to seek out the commander. Rather, we find that, after considering SFC Salisbury's advice that "coming clean" was his best option under the circumstances, the appellant approached the commander voluntarily, with the desire to minimize the consequences of his misconduct. We attach no "presumptive taint" to the appellant's subsequent statements to CPT Zimmerman. *See United States v. Steward*, 31 M.J. 259, 264 (C.M.A. 1990). Significantly, CPT Zimmerman was unaware of the appellant's earlier, unwarned statements to SFC Salisbury, and thus did not exploit them to obtain the appellant's oral and written confessions to him. *Cf. United States v. Spaulding*, 29 M.J. 156, 159–60 (C.M.A.1989).

After reinitiating contact with military authorities and being advised for the second time that he had the right to consult with counsel and the right to remain silent, the appellant chose to speak. We conclude that the appellant's oral and written statements to his commander were voluntary, and not the product of his earlier, unwarned statements to SFC Salisbury.

### (b) Statements to SGT Daniels

 The appellant's statements to SGT Daniels were made after consulting with a defense counsel and with the appellant's full understanding that he did not have to make a statement or be questioned. Such state-

ments also fall within the reinitiation exception to *Edwards*. While the appellant did not affirmatively ask to talk to SGT Daniels after speaking with CPT Zimmerman, the evidence demonstrates that he went to SGT Daniels' office voluntarily, after consulting with his defense counsel. Any arguable taint from the appellant's earlier statements to SFC Salisbury and CPT Zimmerman was attenuated by the opportunity to seek legal advice and by the rights warnings SGT Daniels provided. We perceive no error in the military judge's decision to admit the appellant's sworn statement to SGT Daniels.

## II. THE CLEMENCY PETITION AND POST–TRIAL DELAY

The military judge did not authenticate the record of trial until 20 November 1998, some ten months after the trial concluded.[8] The appellant's lead trial defense counsel prepared clemency submissions on the appellant's behalf and forwarded them to the appellant for his review.[9] The submissions, dated 20 December 1998, consisted of a three-page memorandum to the convening authority on the appellant's behalf, and a number of supporting documents. The lead defense counsel also provided the petition and the supporting documents to the government, anticipating the appellant's concurrence with the submissions on his behalf.

When the appellant received the clemency petition, he had concerns about its length. Believing that the convening authority was unlikely to pay close attention to anything over a page in length, the appellant contacted his lead defense counsel to discuss the submission. By the conclusion of their conversation, the appellant had relieved his lead defense counsel and indicated that the assistant

---

7. Although the appellant had requested an attorney when in the custody of the military police a day earlier, his decision to approach CPT Zimmerman constituted a "reinitiation" within the meaning of *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

8. The record does not reflect that either of the appellant's trial defense counsel was provided an opportunity to examine the record before authentication. We remind staff judge advocates that Rule for Courts-Martial 1103(i)(1)(B) [hereinafter R.C.M.] requires the trial counsel to permit the

defense counsel to examine the record before authentication, unless "unreasonable delay will result." As there is no allegation that the record is incomplete or inadequate, we perceive no need for corrective action in this case.

9. These facts are summarized from the record and from two affidavits submitted on appeal by the appellant and his lead defense counsel. We granted the appellate defense counsel's motion to admit these two documents.

trial defense counsel would handle clemency matters on his behalf. The relieved lead defense counsel promptly informed the government that the appellant had fired her and requested that the earlier submission not be forwarded to the convening authority, as the appellant objected to the submission.

Later, the government representative informed the newly named lead defense counsel that the clemency submissions previously submitted would be forwarded to the convening authority. Concerns about the already lengthy post-trial delay and a desire to avoid any additional delay to await the appellant's new submissions apparently prompted the government's desire to proceed without waiting for any additional materials from the appellant. The convening authority took action on 8 January 1999, nearly a year after the appellant's trial concluded.

▮▮▮▮ An appellant is entitled to effective assistance of counsel post-trial. *See United States v. Russell,* 48 M.J. 139, 140 (1998); *United States v. Spurlin,* 33 M.J. 443 (C.M.A.1991). Although we find error in the submission of the original clemency memorandum to the convening authority on the appellant's behalf, in spite of his withdrawal of those matters, we find no prejudice.[10] The appellant was represented by conflict-free counsel. *See United States v. Carter,* 40 M.J. 102, 106 (C.M.A.1994). Aside from the length, the appellant points to no errors, misstatements, or positions contrary to his desires set forth in the petition the convening authority reviewed. Further, the appellant has not provided us with the clemency matters he actually wanted the convening authority to consider; thus, he has given us no basis for comparison.[11] *See United States v. Wheelus,* 49 M.J. 283, 288 (1998). We have considered *United States v. Leaver,* 36 M.J.

133 (C.M.A.1992), cited by the appellant, but find it to be factually distinguishable from this case, because at no time was this appellant without representation. When he "fired" his lead trial defense counsel, his assistant defense counsel at trial assumed post-trial duties on his behalf.

We have considered the matters submitted on the appellant's behalf, and find them to be a cogent and persuasive summary of the legal errors raised at trial (and in this appeal). The submissions include a plea for clemency based on the appellant's previous military record, his performance while incarcerated, and his rehabilitative efforts. There is nothing in this record (or in any other records we have reviewed) to indicate that convening authorities in general, or this convening authority in particular, consider the length rather than the content of the materials submitted for their review in deciding whether to grant clemency. We are hard-pressed to find any harm to the appellant from this submission on his behalf. *See* UCMJ art. 59(a), 10 U.S.C. § 859(a).

▮▮▮ As this court noted in *United States v. Collazo,* 53 M.J. 721 (Army Ct.Crim.App. 2000), this particular military installation has experienced significant delays in post-trial processing of courts-martial actions. In *Collazo,* we granted relief as a matter of sentence appropriateness, based on an unexplained delay of ten months in preparing a 519–page record of trial. *See also* UCMJ art. 66(c); *United States v. Bauerbach,* 55 M.J. 501 (Army Ct.Crim.App.2001).

In this case, a 459–page record of trial took over ten months to prepare. That is simply too long. We will grant appropriate relief in our decretal paragraph.

---

10. We note that the post-trial recommendation fails to advise the convening authority of the one day of pretrial confinement credit granted by the military judge and advises that the military judge dismissed Charge IV and its specifications with prejudice, not without prejudice, as the recommendation states. We are satisfied that the appellant was not prejudiced by these errors.

11. The convening authority did not act on the appellant's case for nineteen days after the lead trial defense counsel submitted the 20 December 1998 clemency submission. That was ample time for the appellant to submit new or additional matters through his new defense counsel, particularly since that counsel had participated as the assistant defense counsel throughout the trial. *Cf.* R.C.M. 1106(f)(5) (providing defense counsel with ten days to submit matters pertaining to the staff judge advocate's recommendation); R.C.M. 1105(c)(1) (providing defense counsel with ten days to submit clemency matters after service of the staff judge advocate's recommendation).

## III. DECISION

The findings of guilty are affirmed. After considering the entire record, the court affirms only so much of the sentence as provides for a dishonorable discharge, confinement for thirty-four months, forfeiture of all pay and allowances, and reduction to Private E1. The appellant will be credited with one day of pretrial confinement credit against the sentence to confinement.

Senior Judge CAIRNS and Judge BROWN concur.