# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**THE COURT EN BANC**

**UNITED STATES OF AMERICA**

v.

**MYLES R. SPURLING**
**PRIVATE FIRST CLASS (E-2), U.S. MARINE CORPS**

**NMCCA 201400124**
**SPECIAL COURT-MARTIAL**

**Sentence Adjudged:** 26 November 2013.
**Military Judge:** LtCol C.M. Greer, USMC.
**Convening Authority:** Commanding Officer, 10th Marine
Regiment, 2d Marine Division, Camp Lejeune, NC.
**Staff Judge Advocate's Recommendation:** Maj J.N. Nelson,
USMC.
**For Appellant:** Maj John Stephens, USMC.
**For Appellee:** Maj David Roberts, USMC; Maj Paul M. Ervasti,
USMC.

**16 October 2014**

---
## OPINION OF THE COURT
---

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS
PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

WARD, S.J., delivered the opinion of the court in which
MITCHELL, C.J., MCFARLANE, S.J., HOLIFIELD, J., and BRUBAKER,
J., concur.  KING, J., filed a dissenting opinion joined by
FISCHER, S.J., and MCDONALD, J..

WARD, Senior Judge:

   A special court-martial, consisting of members with
enlisted representation, convicted the appellant, contrary to
his pleas, of one specification of making a false official

statement, in violation of Article 107, Uniform Code of Military Justice.[1]  The members sentenced the appellant to reduction to pay grade E-1 and a bad-conduct discharge.  The convening authority approved the sentence as adjudged but, as a matter of clemency, suspended the bad-conduct discharge for a period of twelve months.

On appeal, the appellant asserts three assignments of error: (1) that the military judge committed plain error by failing to suppress the appellant's statements obtained in violation of Article 31(b), UCMJ, and the Fifth Amendment;[2] (2) that trial defense counsel (TDC) were ineffective for failing to object to admission of his statements; and (3) that his sentence was inappropriately severe.  After carefully considering the record of trial and the submissions of the parties, we find merit in the appellant's third assigned error and grant relief accordingly.  Following our corrective action, we find no error materially prejudicial to a substantial right of the appellant remains.  Arts 59(a), 66(c), UCMJ.

**Factual Background**

A member of 10th Marine Regiment (10th Marines) the appellant was temporarily attached to augment the 1st Battalion, 10th Marines (1/10) during an Integrated Training Exercise (ITX) in May 2013.  Personnel from both 10th Marines and 6th Marines participated in the ITX at Twentynine Palms, California.  The Marines were billeted at Camp Wilson, a small camp within the training area where personnel participating in ITX staged.  Camp Wilson included a recreational facility that served food and beer called the "Warrior Club".  Although Marines of legal drinking age could drink beer at the Warrior Club, the 1/10 commanding officer issued an order prohibiting all 1/10 personnel from consuming any alcohol while at ITX.  Consequently, 1/10 was a "dry" battalion for the duration of the exercise.

On 30 May 2013, the appellant went to the Warrior Club where he bought two cups of beer and sat down at a table with two other 1/10 Marines, Lance Corporal (LCpl) Mulhauser and LCpl Terry.  After he sat down, he offered one of his beers to the two Marines who responded that they were not permitted to drink.

---

[1] 10 U.S.C. § 907.

[2] For the reasons discussed in our analysis of the appellant's ineffective assistance claim, we find no plain and obvious error by the military judge.

LCpl Mulhauser testified at trial that the appellant appeared surprised when they said this and the appellant said that he was unaware of the no-alcohol order.[3]

Sitting several tables away playing cards were two noncommissioned officers (NCOs), Corporal (Cpl) Brooks and Sergeant (Sgt) Moyta. Both were members of 1/10 and Cpl Brooks, like the appellant, was assigned to Headquarters Battery, 1/10. Cpl Brooks recognized the appellant as he walked by holding two cups of beer. Cpl Brooks then told Sgt Moyta that "one of our . . . Headquarters Battery Marines is over here, and he's got two beers in front of him."[4] Cpl Brooks, accompanied by Sgt Moyta, then approached the table where the appellant was sitting. At trial, Cpl Brooks testified to the following exchange:

> "A [Cpl Brooks]: . . . I talked to PFC Spurling and I said: "What do you have?" He told me: "Beer." Therefore confirming what I thought. I said: "Okay. Who are you with?" He stated: "Regiment." I said: "Okay. What Regiment?" And he just – he gave me a blank stare, I said: "Well, there's 6th Marine Regiment, there's 10th Marine Regiment," naming off the units that were . . . part of ITX. At that time he said, "6th Marine Regiment." I said: "Try again."
>
> Q: And why did you say "try again?"
> A: Because I knew that he was not being honest with me.
>
> Q: [D]id you know what regiment he was part of?
> A: . . . I did at that time . . . .
>
> Q: Then why did you ask him?
> A: Well I asked him because I wanted him to tell me what he was doing and tell me what he was doing wrong.
>
> Q: Okay. So after he said "6th Marine Regiment," what did you say?
> A: I said, "Try again."
>
> Q: And what was his response?

---

[3] Record at 173.

[4] *Id*. at 197.

3

A: A blank stare. Then I said – I kind of looked at him – we stared at each other for a minute, he looked at me and said: "10th Marine Regiment." I said: "Okay. That means that you are attached to?" Implying that he would finish the sentence and he just said "10th Marine Regiment." And I said: "So, you're with 1/10 right?" And he said: "Yes." So, okay. "So you are aware of the fact that our battalion is dry?"

Q: And what was his response . . . ?
A: At that time he said: "Yes.". . . I said: "So why are you drinking?" He said: "My staff sergeant said I could."

. . . .

Q: Okay, after he told you that, what did you say?
A: I said: . . . "Who's your staff sergeant?" He said: "Staff Sergeant Good." I asked -- I looked at him and said: "Your staff sergeant verbally stated that you could consume alcohol regardless of the battalion policy?" And he said: "Yes."[5]

Cpl Brooks also testified that during this exchange the appellant was "disrespectful" and "rolled his eyes [and] didn't stand up."[6] Following this exchange, the appellant poured out the beer and left the Warrior Club.

Cpl Brooks testified that he and Sgt Moyta then went to find Staff Sergeant (SSgt) Good. After Sgt Moyta explained the incident, SSgt Good accompanied Sgt Moyta to the appellant's tent where SSgt Good confronted the appellant with both the drinking and using his name. However, the appellant only admitted to identifying SSgt Good as his platoon sergeant, he denied telling Cpl Brooks that SSgt Good authorized him to drink alcohol.[7]

At no time did Cpl Brooks or SSgt Good inform the appellant of his rights under Article 31(b), UCMJ. Ultimately, the appellant was charged with failing to obey the 1/10 commanding

---

[5] *Id.* at 186–87.

[6] Id. at 188.

[7] *Id*. at 226.

4

officer's no-alcohol order and with making a false official statement by stating that "Staff Sergeant Good said it was o.k. for me to drink alcohol" or words to that effect.[8]  At trial, the appellant's statements to Cpl Brooks and SSgt Good were admitted without objection.

Although they raised no objection, TDC[9] disputed the Government's theory that the appellant knew of the no-alcohol order.  TDC called several witnesses who testified that the command relied upon formations to inform 1/10 Marines of the order and that the appellant may not have been at these formations.  In closing argument and in reference to the allegation that the appellant made a false official statement, TDC highlighted the inconsistencies in the Government witnesses' testimony and argued that these inconsistencies were evidence that the appellant "never said that."[10]  The members acquitted the appellant of failing to obey a lawful order, but convicted him of making a false official statement.

### Ineffective Assistance of Counsel

On appeal, the appellant alleges that Cpl Brooks was required to provide him Article 31(b), UCMJ, rights warnings prior to questioning him, and that failing to do so rendered his statement inadmissible at trial.[11]  Concomitantly, the appellant alleges that TDC's failure to file a motion to suppress or object to admission of the appellant's statement amounted to ineffective assistance under *Strickland v. Washington,* 466 U.S. 668 (1984).  The Government counters that *Strickland* is an "extremely deferential" standard and that TDC's failure to challenge the statement was a strategic or tactical decision that this court should not "second-guess."[12]

This court ordered affidavits from both TDC, wherein 1stLt B candidly concedes that she failed to "recognize the issue based on [her] lack of experience, the work load at the time,

---

[8] Charge Sheet.

[9] The appellant was represented by First Lieutenant (1stLt) B and Captain (Capt) B.  1stLt B acted as lead defense counsel.  Unless otherwise specified, "TDC" refers to both.

[10] Record at 322.

[11] Appellant's Brief of 29 Apr 2014 at 28-29.

[12] Government Brief of 30 Jun 2014 at 15.

and never having argued an Article 31 issue" and that she "should have filed a motion to suppress."[13] Capt B concurs, stating that had the issue occurred to him "[he] would have proposed filing it."[14] Both TDC acknowledge that it was not until after participating in a post-trial debrief with the military judge, who asked whether they had filed a suppression motion, that they recognized the issue.[15]

An accused service member is guaranteed the right to effective assistance of counsel through the Sixth Amendment.[16] We analyze ineffective assistance of counsel claims under the two-prong test outlined in *Strickland*. In order to prove ineffective assistance of counsel, the appellant must show: (1) that his trial counsel's performance was deficient and (2) that the deficiency resulted in prejudice.[17] "When reviewing ineffectiveness claims, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [appellant].' . . . Rather, '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *United States v. Datavs*, 71 M.J. 420, 424-25 (C.A.A.F. 2012) (quoting *Strickland*, 466 U.S. at 697). Because we conclude that the appellant has failed to demonstrate prejudice in this case, we do not reach the question of deficient performance.

"'[W]hen a claim of ineffective assistance of counsel is premised on counsel's failure to make a motion to suppress evidence, an appellant must show that there is a reasonable probability that such a motion would have been meritorious.'" *United States v. Jameson*, 65 M.J. 160, 163-64 (C.A.A.F. 2007) (quoting *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001). Moreover, the likelihood of success on the motion to suppress must be "substantial, not just conceivable." *Cullen v.*

---

[13] Government Response to Court Order filed on 23 Jul 2014, 1stLt B Affidavit at ¶ 7.

[14] Government Response to Court Order filed on 14 Aug 2014, Capt B Affidavit at ¶ 5.

[15] The trial judge did not preside over arraignment or pretrial motion hearings.

[16] *United States v. Gooch*, 69 M.J. 353, 361 (C.A.A.F. 2011).

[17] *United States v. Scott*, 24 M.J. 186, 188 (C.M.A. 1987).

*Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1403 (2011) (citation and internal quotation marks omitted).[18]

In the unique context of a case where the defect is failure to raise a motion, we first must evaluate the likelihood of that motion's success before moving onto the question of any impact on the fact finder and the verdict. In this case, we conclude that the appellant fails to show a substantial likelihood of success in prevailing on a motion to suppress and, accordingly, we find that he fails to carry his burden of demonstrating prejudice.

## Official Law-Enforcement or Disciplinary Capacity

The Court of Military Appeals has held that, "[b]ecause of the effect of superior rank or official position upon one subject to military law, the mere asking of a question under certain circumstances is the equivalent of a command." *United States v. Duga,* 10 M.J. 206, 209 (C.M.A. 1981). Specifically, the Court of Military Appeals affirmed that, "[c]areful consideration of the history of the requirement of warning, compels a conclusion that its purpose is to avoid impairment of the constitutional guarantee against compulsory self-incrimination. . . . A person subjected to these pressures may rightly be regarded as deprived of his freedom to answer or to remain silent." *Id*. This protection applied to situations in which, "because of military rank, duty, or other similar relationship, there might be subtle pressure on a suspect to respond to an inquiry." *United States v. Price*, 44 M.J. 430, 432 (C.A.A.F. 1996) (citing *United States v. Gibson,* 14 C.M.R. 164 (C.M.A. 1954)).

However, the court also expressed concern that a literal application of Article 31 would "potentially have a comprehensive and unintended reach into all aspects of military life and mission." *United States v. Cohen*, 63 M.J. 45, 49

---

[18] Although the standard of "reasonable probability" may suffer from a lack of granularity, any difference between this standard and the more familiar standard of preponderance of the evidence "is slight and matters 'only in the rarest case.'" *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 791-92 (2011) (quoting *Strickland*, 466 U.S. at 693). Here, we employ a "substantially different" standard from other cases where we evaluate prejudice resulting from constitutional error. *See United States v. Gutierrez*, 66 M.J. 329, 331 (C.A.A.F. 2008) (rejecting harmless beyond a reasonable doubt standard used by service court of appeals, instead finding that, but for counsel's assumed deficiency, "it is just as likely that the members would have convicted as it is that they would have acquitted.").

(C.A.A.F. 2006) (discussing *Gibson*). Therefore, the Court of Appeals for the Armed Forces narrowed the aperture by declaring that Article 31(b) rights warnings are required only if: (1) the person being interrogated is a suspect at the time of questioning, and (2) the person conducting the questioning is participating in an official law enforcement or disciplinary investigation or inquiry.[19]

On this second requirement, Article 31(b) warnings must be provided to a suspect if "'the person conducting the questioning is participating in an official law enforcement or disciplinary investigation or inquiry," *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000), as opposed to "a personal motivation for the inquiry," *United States v. Jones*, 73 M.J. 357, 361 (C.A.A.F. 2014), or an administrative or operational purpose, *Cohen*, 63 M.J. at 51.[20] Any questioning of a suspect by a military superior in his immediate chain of command will create a "strong presumption" that the questioning was for disciplinary purposes. *Swift*, 53 M.J. at 448 (citing *United States v. Good*, 32 M.J. 105, 108 (C.M.A. 1991)).

Thus to evaluate the merit of a motion to suppress, we must examine all "the facts and circumstances at the time of the interview to determine whether [Cpl Brooks] was acting or could reasonably be considered to be acting in an official law-enforcement or disciplinary capacity."[21] *Swift*, 53 M.J. at 446 (internal quotation marks omitted). Whether Cpl Brooks could reasonably be considered to be acting in such an official capacity, is "judged by reference to 'a reasonable man in [the appellant's] position.'" *Jones*, 73 M.J. at 362 (quoting *Good*, 32 M.J. at 108 n.2). These are questions we determine *de novo*.[22]

We first turn our attention to the relationship between Cpl Brooks and the appellant. The record makes abundantly clear that Cpl Brooks did not occupy a supervisory position in the appellant's chain of command as envisioned under *Swift*. He was

---

[19] *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000).

[20] *See also United States v. Loukas,* 29 M.J. 385 (C.M.A. 1990).

[21] Because our analysis turns on the second prong of *Swift*, i.e. whether the questioner is acting pursuant to an official law enforcement or disciplinary investigation or inquiry, we need not address whether the appellant was a suspect at the time Cpl Brooks questioned him.

[22] *Jones*, 73 M.J. at 361.

no more than an NCO in the appellant's battery.[23]  In fact, he testified on cross that the appellant was not in his section of between four and eight Marines.[24]  Therefore, we find little evidence to support the "strong presumption" articulated in *Swift*.

Second, we examine the context of their conversation.  Cpl Brooks explained at trial that he went over to the appellant's table to "confront" him, and their conversation could hardly be described as purely casual.  But not all official interaction between a senior and a subordinate is per se "disciplinary."[25]  When Cpl Brooks went over to the appellant's table with Sgt Moyta, his stated purpose in confronting the appellant for approximately "two minutes" was for "[the appellant] to tell me exactly what he was doing wrong first.  I wanted to instruct the Marine, not just belittle him, anything of that nature.  *I wanted to let him know [he was] doing wrong, now correct it.*"[26]  LCpl Mulhauser, sitting at the table next to the appellant, shared a similar view and described the conversation as a "counseling."[27]  In particular, LCpl Mulhauser described it as follows:

> I know that Corporal Brooks, Sergeant Brooks now, came over with the intentions to counsel him, to inform him that 1/10 was dry.  And Sergeant Moyta – I don't recall him saying anything.  Midway thru (sic), Terry and I got up and left the table to let the NCOs do their thing with a junior Marine.  But I don't recall specifics, I know vaguely that it was meant to be a counseling session to more – to inform him that, hey, even though you're a detachment you still can't drink.[28]

---

[23] Record at 184-85.

[24] *Id*. at 194.  Cpl Brooks testified that he did not even know the appellant until seeing him at a headquarters battery formation at ITX.  While Cpl Brooks was also a member of headquarters battery, he testified that his only interaction with the appellant was on occasion as Corporal of the Guard when he assigned basic watches to the appellant on the fire watch roster.  *Id*. at 185.

[25] *See*, *e.g.*, *Loukas*, 29 M.J. at 389.

[26] Record at 199-200 (emphasis added).

[27] *Id*. at 173-74.

[28] *Id*.

Also informative is the setting where this conversation occurred -- the Warrior Club, a large recreational facility where Marines from the ITX could relax and in the words of LCpl Mulhauser "get our free time on".[29]  Cpl Brooks and Sgt Moyta were sitting nearby playing cards when the situation dictated that they intercede.  Furthermore, the appellant's attitude during the conversation suggests nothing more than informal counseling.  Both Sgt Moyta and Cpl Brooks testified that throughout the conversation the appellant remained "disrespectful", "rolled his eyes", and acted "a little bit belligerent."[30]

Still another fact is the grade and the position of the questioner.  Cpl Brooks, other than being an NCO, held no official law enforcement or disciplinary position at the time.  He was not acting as a military policeman, a corporal of the guard, or a sentinel.  To the contrary, he was on liberty playing cards a few tables away from the appellant.  Although he went over to confront the appellant, there is no evidence indicating that his purpose was to take formal disciplinary action such as place the appellant under apprehension, interrogate him, or request a formal statement.  On the contrary, his self-described purpose was far more informal -- he wanted the appellant simply to "tell me what he was doing and tell me what he was doing wrong."[31]

Even if Cpl Brooks realized the possibility of further action in light of other alcohol-related incidents in the command,[32] we still must look at the totality of the

---

[29] *Id*. at 171.

[30] *Id*. at 188, 206.

[31] *Id*. at 187.  Other than military police and perhaps a few other limited situations, law enforcement investigations and official disciplinary matters such as conducting preliminary inquiries, interrogating suspects and/or taking formal witness statements are not the normal province of an E-4.  *See Loukas*, 29 M.J. at 388 (cautioning against overly broad application of Article 31 to those not normally involved in interrogating or requesting statements from others suspected of crime) (quoting *Gibson*, 14 C.M.R. at 170).

[32] Cpl Brooks and Sgt Moyta testified that they had heard or were aware of other alcohol-related incidents within the battalion.  However, the only evidence in the record of any other alcohol-related incident resulting in disciplinary action came from the commanding officer who testified that beside the appellant, there was one other "alcohol-related incident" during the ITX.  That incident involved the battalion color sergeant and resulted in some form of reprimand or disciplinary action.  Record at 163-64.

10

circumstances, including "whether the questioning was 'designed to evade the accused's constitutional or codal rights.'" *Cohen*, 63 M.J. at 50 (quoting *United States v. Bradley*, 51 M.J. 437, 441 (C.A.A.F. 1999)). As revealed by the testimony above, there is no evidence of any such intent by Cpl Brooks. Rather, the record makes abundantly clear that any actions occurring afterward that took on a more official appearance, e.g. SSgt Good confronting the appellant later in the appellant's tent, arose from the appellant's unwise decision to use SSgt Good's name.

The facts in the record do not support a reasonable probability of success on a motion to suppress the appellant's statements to Cpl Brooks. Any chance of success turns on whether Cpl Brooks was acting in an official law enforcement or disciplinary capacity at the time of his questioning. On this record, the appellant faces several significant hurdles in meeting that challenge, not the least of which is Cpl Brooks's own testimony describing his intent as administrative in nature – to "fix" or "correct" a junior Marine seemingly ignoring the rules. A second obstacle to the appellant's likelihood of success is the objective viewpoint of LCpl Mulhauser who likewise described the conversation as an informal "counseling."

These facts, together with the remainder, lead us to conclude that the appellant's chances of prevailing on a suppression motion fall short of the "substantial, not just conceivable" likelihood necessary. *Pinholster*, 131 S.Ct. at 1403. Therefore, even assuming that TDC were deficient, we conclude that the appellant fails to carry his burden of demonstrating prejudice within the meaning of *Strickland*.

## Sentence Appropriateness

In his final assignment of error, the appellant contends that a bad-conduct discharge is inappropriately severe. We agree. In accordance with Article 66(c), UCMJ, we "may affirm only such findings of guilty and the sentence or such part or amount of the sentence as [we] find[] correct in law and fact and determine[], on the basis of the entire record, should be approved." Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves.[33] This requires "'individualized consideration' of the particular accused 'on

---

[33] *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988).

11

the basis of the nature and seriousness of the offense and the character of the offender.'" *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (quoting *United States v. Mamaluy*, 27 C.M.R. 176, 180-81 (C.M.A. 1959)). We independently determine the appropriateness of the sentence in each case we affirm.[34]

Following challenges and excusals, the military judge empanelled four enlisted members; a staff sergeant (E-6) and three corporals (E-4). After presentation of evidence and argument, the panel found the appellant not guilty of failing to obey the battalion commander's no-alcohol order, but guilty of making a false official statement by saying that SSgt Good authorized him to drink alcohol. Based on the members' verdict, we are left with only a single instance of lying to an NCO while being counseled.

Considering the panel composition, the nature of the members' verdict, and the lack of any readily identifiable aggravating circumstances, we are not "assur[ed] that justice [was] done and that the [appellant] g[ot] the punishment he deserve[d]." *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988).

## Conclusion

Accordingly, we affirm the findings of guilty and only so much of the approved sentence as provides for reduction to pay grade E-1.

Chief Judge MITCHELL, Senior Judge MCFARLANE, Judge HOLIFIELD, and Judge BRUBAKER concur.


KING, Judge (dissenting):

While I concur with the majority's finding that a bad-conduct discharge is not appropriate in this case, I would reverse the appellant's conviction because of ineffective assistance of counsel. In my view, the majority's "mechanical" analysis is the very approach that the Supreme Court cautioned against in *Strickland v. Washington*, 466 U.S. 668 (1984). Instead, the record indicates a "reasonable probability" that a motion to suppress would have merit and I would return the case to provide the appellant the opportunity to litigate that

---

[34] *See United States v. Baier*, 60 M.J. 382, 384-85 (C.A.A.F. 2005).

motion.  Without that opportunity, I am not convinced that the appellant received a fair trial.  Accordingly, I respectfully dissent.

### 1.  Trial defense counsel's performance was deficient

I begin by recognizing that scrutiny of trial defense counsels' (TDC) performance "must be highly deferential" and that there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id*. at 689.  Since counsel are presumed competent, an appellant must rebut this presumption by showing specific errors that were unreasonable under prevailing professional norms.[1]

A servicemember's protection against compulsory self-incrimination is a "fundamental right" protected by Article 31, UCMJ.  *United States v. Mapes*, 59 M.J. 60, 65 (C.A.A.F. 2003).  Although reasonable minds may differ on when Article 31(b) applies to a given situation, there can be no determination one way or the other without first recognizing and analyzing the issue.  Therefore, it is incumbent upon counsel to recognize issues relating to a servicemember's right against self-incrimination in the military context.  Here, TDC concede that they failed to do so until the issue was raised by the military judge during a post-trial debrief.  While I recognize that counsels' admirable efforts with respect to Charge I resulted in an acquittal, their failure to at least recognize the Article 31 issue at play with respect to Charge II fell below prevailing professional norms.  As such, it was deficient.[2]  Neither "inexperience" nor "workload" can justify such a deficiency.

### 2.  Prejudice

Turning to prejudice, the appellant must show that there was a "reasonable probability" that a suppression motion would have been meritorious had his counsel raised an Article 31(b), UCMJ, motion.  *United States v. Jameson*, 65 M.J. 160, 163-64 (C.A.A.F. 2007) (quoting *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001)) (additional citation and internal

---

[1] *United States v. Scott*, 24 M.J. 186, 188 (C.M.A. 1987) (citing *United States v. Cronic*, 466 U.S. 648 (1984)).

[2] *See Murray v. Carrier*, 477 U.S. 478, 496 (1986) (stating that the right to effective counsel "may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial." (quoting *Cronic*, 466 U.S. at 657, n.20)).

13

quotation marks omitted). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To determine whether there is a reasonable probability that a suppression motion would have been successful, it is necessary to consider the merits of the Article 31(b) issue.

Article 31(b), UCMJ provides: "No person subject to this chapter may interrogate, or request any statement from . . . a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used against him in a trial by court-martial."

## A. Suspect

Whether a person is a suspect is an objective question that "is answered by considering all the facts and circumstances at the time of the interview to determine whether the military questioner believed or reasonably should have believed that the servicemember committed an offense." *United States v. Good*, 32 M.J. 105, 108 (C.M.A. 1991) (citations omitted). *See also United States v. Jones,* 73 M.J. 357 (C.A.A.F. 2014).

Corporal (Cpl) Brooks testified that he knew the appellant was a member of 1/10; that he knew of the order prohibiting members of 1/10 from consuming alcohol while at the ITX; and that he saw the appellant at the ITX with two cups of beer in his hand. Upon seeing the appellant with the beer, Cpl Brooks testified that he became suspicious that the appellant was violating a lawful order. Under the totality of the circumstances, and considering the "relatively low quantum of evidence required to treat an individual as a suspect," *United States v. Swift,* 53 M.J. 439, 447 (C.A.A.F. 2000), I have little difficulty concluding that Cpl Brooks believed that the appellant had committed an offense.

## B. Disciplinary Capacity

Under applicable case law, Article 31(b) does not require that a suspect be warned of his rights before questioning unless "the military questioner was acting or could reasonably be considered to be acting in an official law-enforcement or disciplinary capacity." *Jones*, 73 M.J. at 361 (quoting *United States v. Cohen*, 63 M.J. 45, 50 (C.A.A.F. 2006)) (additional citation and internal quotation marks omitted). This is a

14

question of law that an appellate court reviews *de novo*.[3]  On this question of law, I disagree with the majority.

The record is clear that Cpl Brooks did not have any law-enforcement responsibilities.  As such, there is no reasonable probability that the appellant would have prevailed on a suppression motion due to a finding that Cpl Brooks was acting in an official law-enforcement capacity when he questioned the appellant.

Conversely, and contrary to the majority's attempts to characterize this as an "informal" interaction, it is equally clear that Cpl Brooks' questioning of the appellant was not a casual conversation between friends.  If the questioning had been part of a casual conversation, then the appellant could not have been convicted of making a false *official* statement.[4]  Moreover, the record is clear that the appellant and Cpl Brooks were not friends.  Indeed, any interaction between Cpl Brooks and the appellant previous to the questioning was purely "professional in nature" based upon Cpl Brooks supervisory responsibilities over the appellant as Corporal of the Guard when the appellant stood watches.[5]

And so the question of prejudice boils down to whether, had the suppression motion been raised, there is a reasonable probability that the military judge would have found: (1) that Cpl Brooks was acting in an official disciplinary capacity, or (2) that Cpl Brooks could reasonably be considered to be acting in a disciplinary capacity.  The majority answers both questions in the negative.

Before turning to the record, I begin by noting my disagreement with the majority's choice of standard to apply to this analysis.  The majority is correct that there is a "substantial difference" between a *Strickland* prejudice analysis and the standard of harmless beyond a reasonable doubt that applies to other constitutional errors.  But in *United States v. Gutierrez*, 66 M.J. 329 (C.A.A.F. 2008), which the majority cites to elucidate the standard that applies to our prejudice analysis, the court was more concerned with which party bears the burden of showing prejudice, not the quantum of proof needed

---

[3] *Jones*, 73 M.J. at 361.

[4] *See United States v. Spicer*, 71 M.J. 470, 474 (C.A.A.F. 2013).

[5] Record at 185.

15

to undermine an appellate court's confidence in the outcome of the case.[6]  On the quantum of proof required, *Strickland* is more instructive, stating "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."  466 U.S. at 693.  Instead, "the appropriate test for prejudice ... [is whether] there is a reasonable probability that, but for the [deficiency] the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Struggling to define "reasonable probability," the majority expands this test and announces in a footnote that the "reasonable probability" standard is akin to a preponderance of the evidence.[7]  But in my view, reliance upon such dicta trounces the "fundamental fairness" standard of *Strickland*.

In defining "reasonable probability" as akin to a preponderance of the evidence, the majority cites to *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770 (2011).  In *Richter*, the appellant's prejudice argument rested on the notion that the Government's overwhelming evidence of guilt in a murder trial could have been countered by expert testimony about "a theoretical possibility" that the police were initially mistaken about the exact location of the fatal shooting.  *Richter*, 131 S. Ct. at 792.  Though dicta from *Richter* does compare *Strickland*'s "reasonably likely" standard to a "more-probable-than-not standard," it does not say that the two standards are equivalent.  And that dicta from *Richter* is supported by nothing more than citations back to *Strickland*.

By fashioning a more demanding interpretation of *Strickland*'s reasonable-probability standard, the majority falls prey to exactly what *Strickland* cautioned against — an overly-mechanical application of the standards set forth in that case. In fact, *Strickland* provides that, when we assess prejudice, we have broad discretion to ensure justice:

---

[6] *Gutierrez*, 66 M.J. at 331-32 ("By applying a 'harmless beyond reasonable doubt' test for prejudice, the ACCA improperly shifted the burden to the Government[.]").

[7] Majority Opinion at n.20 ("Although the standard of "reasonable probability" may suffer from a lack of granularity, any difference between this standard and the more familiar standard of preponderance of the evidence "is slight and matters 'only in the rarest case.'"  (Citations omitted)).

> [I]n adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

466 U.S. at 696. Nothing in *Richter* abrogates this statement of the law.

Even more to the point, the Supreme Court said that the choice of standard for the prejudice analysis "should alter the merit of an ineffectiveness claim only in the rarest case." *Id.* at 697. Fundamental fairness, then, is the standard we apply. Everything else is dicta.

Nevertheless, relying upon dicta, a constricted interpretation of the facts, and absolute conclusions about intentions, the majority declares that "the appellant's chances of prevailing on a suppression motion fall short" of a substantial likelihood of success. The majority's conclusion is misplaced for several reasons.

First, the majority claims that Cpl Brooks was acting in an official albeit non-disciplinary capacity when he questioned the appellant. Case law provides numerous examples of official yet non-disciplinary reasons for questioning a service member. A medical officer who asks questions for the purpose of diagnosis is acting in an official yet non-disciplinary capacity.[8] A commander who asks questions for the operational purpose of determining whether to terminate a service member's security clearance is acting in an official yet non-disciplinary capacity.[9] A crew chief who asks questions for the safety-related purpose of determining whether a crew member's erratic behavior during a flight is due to drug use is acting in an official yet non-disciplinary capacity.[10] And so on.

---

[8] *United States v. Fisher*, 44 C.M.R. 277, 278-79 (C.M.A. 1972).

[9] *United States v. Bradley*, 51 M.J. 437, 441 (C.A.A.F. 1999).

[10] *United States v. Loukas*, 29 M.J. 385, 387 (C.M.A. 1990).

However, the facts of this case are not analogous to any case in which a questioner was found to be acting in an official yet non-disciplinary capacity.  There was neither an operational nor a safety-related purpose behind Cpl Brooks' questioning of the appellant.  And contrary to the suggestion in the majority's opinion, there was also no "administrative" purpose behind the questioning.  Rather, Cpl Brooks testified, "I asked him because I wanted him to tell me what he was doing and tell me what he was doing wrong."[11]  On cross examination, Cpl Brooks elaborated:

A.    I saw him sit down with two beers in his hand, ma'am.
      . . .

Q.    And in your mind did you think there's a problem?
A.    Yes, ma'am.

Q.    Why did you think there was a problem?
A.    It's a violation of the rules.

      . . .

Q.    Okay. So tell us -- what is you[r] conversation like with Sergeant Moyta?
A.    I looked at Sergeant Moyta, I said, one of our guys over here, Headquarters Battery Marines is over here, and he's got two beers in front of him.

Q.    Okay.  And rules are rules; right?
A.    Rules are rules, yes, ma'am.

Q.    And you don't want to tolerate that, anyone breaking  the rules; right?
A.    No, ma'am.

Q.    Okay.  And so in order to make sure that good order and discipline was followed you went over there and you  wanted to make sure it was corrected; right?
A.    Yes, ma'am.[12]

---

[11] Record at 187.

[12] *Id*. at 197-98.

The majority finds that Cpl Brooks stated desires "to correct" the appellant is conclusive evidence that Cpl Brooks intended the confrontation to be an "informal counsel[ing]," implying that Cpl Brooks had no intention of forwarding the matter up the chain for discipline. They buttress this certainty by relying upon LCpl Mauhauser's completely speculative statement about what Cpl Brooks' intentions actually were and the fact that LCpls Mulhauser and Terry reacted by getting up and leaving the table. While I recognize the majority's interpretation of intentions may be correct, I also recognize that it may not.

Instead, it is just as reasonable to conclude that Cpl Brooks' stated desire to "correct" the appellant was another way of saying that he intended to enforce compliance with an order that he believed the appellant was violating and, once corrected, would then report that violation to the appellant's immediate superiors for action as deemed appropriate. Tellingly, that is exactly what he did. The majority's conclusion that the appellant's misconduct was only reported because of "the appellant's unwise decision to use SSgt Good's name," is similarly myopic guesswork.

The record repeatedly reflects the battalion commander's (CO) concern about 1/10 Marines consuming alcohol during the ITX. The CO testified that, "we were going to focus on training . . . on putting rounds down range safely and accurately."[13] The no-alcohol consumption order was "a matter of safety and trying to keep all hands focused on the mission[.]"[14] The CO announced that he would have a "zero tolerance" policy for consuming alcohol at staff meetings and battalion all-hands formations.[15] Thereafter, and prior to the appellant consuming alcohol, at least one other battalion Marine was charged with consuming alcohol and received NJP in a manner that "was very evident" to the rest of the battalion.[16]

---

[13] *Id.* at 160.

[14] *Id.*

[15] *Id.* at 159.

[16] *Id.* at 164. Cpl Brooks testified that "[p]retty much everybody knew that the other Marines had got in trouble for drinking." *Id.* at 188. SSgt Good testified "[a] few incidents where Marines got NJP'd for drinking [the drinking policy] was brought up there in the formations." *Id.* at 216.

19

Considering the evident importance to the command of the no-alcohol consumption policy, it is at least reasonable to believe that Cpl Brooks would not have opted to handle this matter alone. That Cpl Brooks would have forwarded the appellant's orders violation for discipline is even more probable when one considers that, when the issue was brought to the appellant's supervisor's attention, Staff Sergeant (SSgt) Good asked the appellant "you know you weren't supposed to drink, right?"[17] After the appellant responded in the affirmative, SSgt Good said "you know there's going to be repercussions," and the appellant "acknowledged that as well."[18] This is evidence that the battalion noncommissioned officers knew that violations of the commanding officer's order to abstain from alcohol were not to be resolved with "counseling." However, again, the majority allows for no such interpretation.

As for the majority's reliance upon the reaction of the two junior Marines who were sitting at the table, I'm left to wonder how the majority would have expected LCpls Mulhauser and Terry to react had Cpl Brooks IN FACT been acting in a disciplinary capacity. It is likely that their reactions and conclusions about intentions would have been no different.

Finally, I find it highly probable that the appellant's decision to respond to Cpl Brooks' questioning was influenced by "subtle pressures" that exist in military society. *See Jones*, 73 M.J. at 360 (quoting *United States v. Duga*, 10 M.J. 206, 209 (C.M.A. 1981)). The incident took place while on a military base during a break in a military exercise. Though he was in a recreational facility, he was abruptly approached by not one but two military superiors. One of these superiors launched immediately into pointed questioning. The peers he had been socializing with moments before got up and left. During this exchange, the appellant became "upset."[19] Then, alone with two of his seniors, the appellant's attempts to equivocate were dismissed out of hand. It is highly likely that the appellant, a lance corporal, would feel compelled to respond to this questioning by his military superiors.

To be clear, I do not conclude that Cpl Brooks necessarily had a duty to warn the appellant of his rights under Article

_____

[17] *Id*. at 208.

[18] *Id*.

[19] Record at 279.

20

31(b).  But I cannot join the majority's reliance upon assumptions, coupled with a mechanical application of *Strickland*, to affirm this conviction.  Instead, the deficiency raises a substantial doubt in my mind about the outcome of this court-martial, and that is precisely what — and all that — the prejudice prong of *Strickland* requires.

To summarize, I believe that a reasonable probability exists that the military judge would have found that Cpl Brooks was either acting in an official disciplinary capacity or could reasonably be seen to be so acting.  Accordingly, I am convinced as a matter of law that a suppression motion would have had a reasonable probability of success.  Applying the standard of fairness, while recognizing that the appellant has the burden of showing prejudice, I am not convinced that the appellant received a fair trial.  In a fair trial, the appellant's counsel would have spotted and fully litigated the Article 31(b) issue giving the military judge the opportunity to apply the law to the fully-developed facts.  Depriving the appellant of this opportunity is a "breakdown in the adversarial process that our system counts on to produce just results."  *Strickland*, 466 U.S at 696.

Therefore, I would set aside the findings and sentence.

Senior Judge FISCHER and Judge MCDONALD join in the dissent.

For the Court


R.H. TROIDL
Clerk of Court

21