**UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Koda M. HARPOLE**
**Seaman (E-3), U.S. Coast Guard**

**CGCMG 0322**
**Docket No. 1420**

**18 December 2019**

| | |
|---|---|
| Military Judges: | CAPT Christine N. Cutter, USCG (trial) |
| | CAPT Matthew J. Fay, USCG (post-trial hearing) |
| Appellate Defense Counsel: | LCDR Jason W. Roberts, USCG (argued) |
| | LCDR Salomee G. Briggs, USCG |
| Appellate Government Counsel: | LCDR Stephen Miros, USCG |
| | LCDR Emily A. Rose, USCG |
| | LT Nicholas J. Hathaway, USCG (argued) |

**BEFORE**
**McCLELLAND, JUDGE & BRUBAKER**
Appellate Military Judges

BRUBAKER, Judge:

A general court-martial of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of false official statement, two specifications of sexual assault, and one specification of housebreaking, in violation of Articles 107, 120, and 130, UCMJ. The military judge conditionally dismissed one of the sexual assault specifications pending appellate review. The members sentenced Appellant to confinement for seven years, reduction to E-1, and a dishonorable discharge, which the Convening Authority approved.

This is our second time considering this case. A panel of this Court initially affirmed the findings and sentence. *United States v. Harpole*, No. 1420 (C.G.Ct.Crim.App. Nov. 10, 2016) (unpub.). The United States Court of Appeals for the Armed Forces (CAAF) set aside that decision and remanded so that a military judge could conduct fact-finding on Appellant's claim

that his counsel were ineffective for failing to seek suppression of his statement to a victim advocate on Article 31(b), UCMJ, grounds.  The CAAF directed that at the conclusion of the hearing, the record of trial and the military judge's findings of fact and conclusions of law be returned to us "for further review in accordance with Article 66, UCMJ."  *United States v. Harpole*, 77 M.J. 231, 238 (C.A.A.F. 2018).

As directed, a military judge conducted a post-trial hearing and entered findings of fact and conclusions of law.  Appellant now raises the following assignment of error:

> Whether the [military judge's] findings, which support the conclusion that trial defense counsel were not ineffective in failing to file a suppression motion on the basis of Article 31(b) where the victim advocate suspected [Seaman] Harpole of sexual assault and did not provide a rights advisement before questioning him about it, are erroneous.[1]

With the benefit of thorough post-trial fact-finding, we agree with the military judge— and with trial defense counsel's pretrial assessment—that a motion to suppress under Article 31(b) would not have succeeded.  Appellant's claim of ineffective assistance thus fails.

## Factual Background

Shortly after getting underway from a port-of-call aboard the USCGC POLAR STAR (WAGB-10), Storekeeper Third Class (SK3) GR made an unrestricted report[2] to the cutter's senior victim advocate that Appellant had, prior to getting underway, sexually assaulted her.  Contrary to SK3 GR's wishes, the command turned the cutter back toward land and transferred her ashore for further transportation to their home station.

Appellant was on the special sea detail to transfer SK3 GR ashore.  After the detail secured, he told his friend, Seaman Boatswain Mate (SNBM) SC, that he felt that *SK3 GR* had assaulted *him*.  With SNBM SC's encouragement, Appellant decided to report this to one of the victim advocates aboard the cutter.  Appellant sought out Yeoman First Class (YN1) HN as his victim advocate because, based on prior interactions with her, he was most comfortable with her.

---

[1] We heard oral argument on this issue on 21 November 2019.

[2] A "restricted report" is one that is made confidentially to a victim advocate in order to receive counseling, medical care, and other assistance without triggering an official investigation.  An "unrestricted report," in contrast, must be disclosed to the command, who must inform law enforcement.

At about 2130, Appellant and SNBM SC awakened YN1 HN with a knock on her stateroom door. YN1 HN asked something along the lines of, "Why do you want to talk to me?"[3] Appellant responded he wanted to talk to her in her victim advocate role.

At that time, YN1 HN knew of SK3 GR's report implicating Appellant; she was informed of it in the process of being directed, in her yeoman capacity, to prepare orders to transport SK3 GR back to their home station. YN1 HN testified, however, that she did not suspect that Appellant was approaching her to talk about the alleged incident with SK3 GR.

YN1 HN escorted Appellant and SNBM SC the short distance to the First Class Petty Officers' lounge, which was empty and would provide privacy. Once inside, she again asked what Appellant needed to talk to her about and whether Appellant was comfortable speaking with her in the presence of SNBM SC.[4] Appellant then recounted essentially the same story he had related to SNBM SC. He asserted that while in SK3 GR's berthing area, he blacked out and that he felt that she had sexually assaulted him while he was blacked out.

YN1 HN testified at the post-trial hearing that she had been taught that a victim advocate was "there in a supportive role" and was not "there to pull information from the victim." (Hearing Transcript at 153.) She thus allowed Appellant to provide his narrative without interruption except at one point when she interrupted to ask what Appellant was doing in female berthing. But she immediately withdrew that question by gesturing in a manner to indicate "never mind." The military judge found that Appellant did not respond to the withdrawn question and instead continued with his narrative.

At no point did YN1 HN provide Appellant with warnings under Article 31(b), UCMJ. Following the interview, YN1 HN informed the senior victim advocate of Appellant's report of sexual assault and together they informed the executive officer and commanding officer.

---

[3] There was conflicting testimony about precisely what YN1 HN asked and when. The military judge adjudicated these conflicts in his supplemental findings of fact, which we do not find clearly erroneous and adopt.

[4] Also, according to Hearing Exhibit X at 7, she explained to Appellant that this would make his report unrestricted, meaning she would have to inform the command, and Appellant understood.

Trial defense counsel moved to suppress Appellant's statement to YN1 HN on the basis that it was a privileged victim advocate-victim communication under Military Rule of Evidence (M.R.E.) 514, Manual for Courts-Martial (MCM), United States (2016 ed.), but they did not pursue a motion to suppress under Article 31(b), UCMJ.  At the post-trial hearing, trial defense counsel testified that they considered an Article 31(b) motion, but assessed that it would fail because the information they had—including discussions with their client—"seemed inconsistent with couching [YN1 HN's] questions as a law enforcement investigation."  (Hearing Transcript at 70.)  Instead, the information:

> pointed to the fact that he very much believed he was a victim.  He was someone that was . . . distraught and seeking help, and everything that [YN1] HN said indicated she was treating him as a victim, did not interrogate him at all, was not acting in a law enforcement capacity or to pursue good order and discipline, was very much in a receiving mode.

(Hearing Transcript at 194).

Trial defense counsel decided instead to focus on a motion to suppress under M.R.E. 514, which they viewed as having a better chance of success and more consistent with their client's wishes.  That motion, however, ultimately was denied and the Government presented evidence of Appellant's statement to YN1 HN against him at trial.

## Law

We review the military judge's factual findings under a clearly erroneous standard while we review his conclusions of law, including the ultimate question of effectiveness of counsel, *de novo.  United States v. Paxton,* 64 M.J. 484, 488 (C.A.A.F. 2007).  "A finding of fact is clearly erroneous when there is no evidence to support the finding, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. Criswell*, 78 M.J. 136, 141 (C.A.A.F. 2018) (internal quotation marks and citations omitted).

To prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both: (1) that his counsel's performance was deficient; and (2) that this deficiency resulted in prejudice.  *United States v. Captain*, 75 M.J. 99, 101 (C.A.A.F. 2016).  When the asserted

ineffective assistance is failure to seek suppression of evidence, an appellant must show: (1) that there is a reasonable probability that a motion to suppress would have been meritorious; and (2) that there is a reasonable probability that the verdict would have been different absent the excludable evidence. *United States v. Harpole*, 77 M.J. 231, 236 (C.A.A.F. 2018).

Appellate courts will not "second-guess the strategic or tactical decisions made at trial by defense counsel." *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009). When an appellant "attacks the trial strategy or tactics of the defense counsel, the appellant must show specific defects in counsel's performance that were 'unreasonable under prevailing professional norms.'" *Id.* (quoting *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F.2006)).

Here, the asserted ineffective assistance is the decision not to pursue suppression of Appellant's statement under Article 31(b), UCMJ, which provides:

> No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

A literal reading of this provision would require Article 31(b) warnings any time four "textual predicates" are met: (1) a person subject to the UCMJ; (2) interrogates or requests any statement; (3) from an accused or a person suspected of an offense; and (4) the statements regard the offense of which the person questioned is accused or suspected. *United States v. Cohen*, 63 M.J. 45, 49 (C.A.A.F. 2006). But because such a broad reading "would potentially have a comprehensive and unintended reach into all aspects of military life and mission," our superior Court has consistently interpreted the phrase "interrogate, or request any statement from" "in context, and in a manner consistent with Congress' intent that the article protect the constitutional right against self-incrimination." *Id.* (citing *United States v. Gibson*, 14 C.M.R. 164, 170 (C.M.A. 1954)).

Specifically, questions are only deemed "interrogat[ing] or request[ing] any statement" when the questioner "is participating in an official law enforcement or disciplinary investigation or inquiry." *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000). This "is determined by assessing all the facts and circumstances at the time of the interview to determine whether the military questioner was acting or could reasonably be considered to be acting in an official law-enforcement or disciplinary capacity." *United States v. Good*, 32 M.J. 105, 108 (C.M.A. 1991). It is normally presumed, however, that "questioning of a suspect by a military superior in his immediate chain of command" is for disciplinary purposes. *Id.*

This creates two scenarios where even if the other predicates are met, questioning is not "interrogat[ing] or request[ing] any statement" within the meaning of Article 31: (1) it is not done for *official* purposes; or (2) even if done for official purposes, it is not done for *law enforcement or disciplinary* purposes. An example of the first category is found in *United States v. Jones*, 73 M.J. 357 (C.A.A.F. 2014). There, the Court held that even though the questioner was a military police augmentee and asked Appellant whether he had committed a burglary, the circumstances of the case drove the Court to the conclusion that the questioner had a *personal* motivation for the inquiry as opposed to an *official* law enforcement or disciplinary purpose. *Id.* at 362–3. *See also United States v. Price*, 44 M.J. 430, 433 (C.A.A.F. 1996).

A bevy of cases fall within the second category and show that even questioning in an official capacity and with an official purpose falls outside of Article 31's ambit when the official purpose is something other than law enforcement or discipline. For example, in *United States v. Bradley,* the Court held that although a suspect's commander was acting in an official capacity in "seeking information needed for the proper review of appellant's security clearance status," he was not conducting a criminal or disciplinary inquiry and thus rights warnings were not required. 51 M.J. 437, 441 (C.A.A.F. 1999). In *United States v. Loukas*, the Court similarly concluded that an aircraft crew chief was not required to preface pre-flight questions about suspected drug use with Article 31(b) warnings because his purpose was to ensure operational safety, not to further a law enforcement or disciplinary inquiry. 29 M.J. 385, 387 (C.M.A. 1990).

It is true, as Appellant points out, that *Bradley* and *Loukas* exemplify what the CAAF has called "a narrow exception to the Article 31(b) requirement for questions that are asked in an 'administrative' or 'operational context.'" *United States v. Ramos*, 76 M.J. 372, 377 (C.A.A.F. 2017). And it is true that questions asked in a victim advocate capacity do not fall neatly within either category. But nor do questions asked in a medical capacity or a psychiatric social worker capacity, and yet those, the CAAF has held, do not implicate Article 31(b). *United States v. Fisher,* 44 C.M.R. 277, 279 (1972) ("A medical doctor who questions an individual solely to obtain information upon which to predicate a diagnosis, so that he can prescribe appropriate medical treatment or care for the individual, is not performing an investigative or disciplinary function; neither is he engaged in perfecting a criminal case against the individual. His questioning of the accused is not, therefore, within the reach of Article 31."); *United States v. Raymond*, 38 M.J. 136, 138 (C.M.A. 1993).

Perhaps, as the Government counters, such cases fall within the "administrative" category. After all, caring and providing for servicemembers is an administrative function of the military. But to us, whether victim advocate services can be termed "administrative" is not the point. This is not a semantic exercise. The point is whether, subjectively and objectively, questions asked in a victim advocate capacity have a law enforcement or disciplinary purpose. *See, e.g., Loukas*, 29 M.J. at 387 (addressing lower court's conclusion that Article 31(b) warnings were required based only on finding that questioner was acting officially: "We disagree as a matter of law because the crew chief's inquiry was not a *law-enforcement or disciplinary* investigation which is also required before Article 31(b) becomes applicable.") (emphasis in original).

A victim advocate's role is not to participate in a law enforcement or disciplinary inquiry. Rather, a victim advocate—much like a social worker or medical professional—provides support and services to individual servicemembers who report that they are crime victims.[5] Extending Article 31(b) warning requirements to these services would result in precisely the type of "comprehensive and unintended reach" that our superior Court has consistently abjured. We

---

[5] *See* Commandant Instruction M1754.10E, *Sexual Assault Prevention and Response (SAPR) Program*, Chapter 1, ¶ O (7 Dec 2016); Coast Guard Tactics, Techniques, and Procedures (TTP) 1-16.1, *Sexual Assault Prevention and Response TTP*, Chapter 5 (19 May 2016).

thus hold that questioning by a victim advocate done solely within that role falls outside the intended reach of Article 31(b), UCMJ.

The fact that victim advocates are required to inform the command, who in turn must inform law enforcement, of receipt of any unrestricted report of sexual assault does not, by itself, convert the purpose of a victim advocate to a law enforcement one. *See Raymond*, 38 M.J. at 139 (holding that a psychiatric social worker was not participating in a law enforcement investigation and thus not required to provide warnings despite a requirement to report suspected child abuse: "Many states require health-care providers and teachers to report allegations of child abuse to appropriate agencies to prevent future abuse. This reporting requirement does not make them law enforcement personnel for the purposes of *Miranda* warnings.") (internal citation omitted).

Instead, each case must be assessed individually to determine the particular questioner's purpose. Knowledge that information will ultimately be conveyed to law enforcement may well be relevant to determine the purpose of questions, but it is that purpose that is the touchstone, not a reporting requirement standing alone. *See, e.g., United States v. Brisbane*, 63 M.J. 106, 112–13 (C.A.A.F. 2006) (distinguishing *Raymond* to hold that social worker *was* required to read rights not just because of a reporting requirement but because case-specific circumstances indicated her questions went beyond social work and had a law enforcement purpose).

A trickier question arises when questions have a dual purpose: partly for a purpose that does not implicate Article 31(b), and partly for a law enforcement or disciplinary purpose that does. In such cases, "the matter must be resolved on a case-by-case basis, looking at the totality of the circumstances, including whether the questioning was 'designed to evade the accused's constitutional or codal rights.'" *United States v. Cohen*, 63 M.J. 45, 50 (C.A.A.F. 2006) (quoting *United States v. Bradley,* 51 M.J. 437, 441 (C.A.A.F.1999)).

### Application

We begin by assessing the military judge's findings of fact. Although there was conflicting evidence, particularly about YN1 HN's questions and Appellant's responses, the

military judge, as was his responsibility, weighed the evidence and made findings of fact. Each, we conclude, is supported by evidence and not clearly erroneous, save one: that Appellant's testimony at the post-trial hearing "has likely been colored by his participation in the lengthy appellate review process at both [this Court and the CAAF]. . . ." (Findings of Fact and Conclusions of Law at 9.) Appellant counters that matters he submitted pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), to this Court prior to its first decision show that his assertions have remained largely consistent throughout the appellate process. Appellant did not offer his *Grostefon* submission as evidence at the hearing, so we are not faulting the military judge for failing to account for it, but because we are "left with the definite and firm conviction that a mistake has been committed," *Criswell*, 78 M.J. at 141, we set aside this finding.

We do not, however, view this finding as significant; it does not impact the remaining findings of fact, which remain well supported by evidence and are not clearly erroneous. That Appellant's assertions since ten months after the trial have remained consistent does not mean they are entitled to greater weight than contrary evidence. The military judge adjudicated the starkly different accounts of Appellant's conversation with YN1 HN. His findings are supported not only by YN1 HN's and SNBM SC's testimony, but that of Appellant's own counsel and contemporaneous trial preparation notes they took.

Thus, with the noted exception, we adopt the military judge's findings of fact for our analysis, which we structure using the questions the CAAF posed in its remand:

> (1) whether legal and tactical considerations were involved in trial defense counsel's decision not to file a motion to suppress Appellant's statements pursuant to Article 31(b), UCMJ;
> (2) whether trial defense counsel's failure to seek suppression of Appellant's communication with the victim advocate pursuant to Article 31(b), UCMJ, was a reasonable strategic decision;
> (3) whether there is a reasonable probability that such a motion to suppress would have succeeded;
> (4) whether there is a reasonable probability that the members' findings would have been different had YN1 HN's testimony been suppressed.

*Harpole*, 77 M.J. at 238.

1. *Whether legal and tactical considerations were involved in decision not to file motion*

Trial defense counsel considered filing a motion under Article 31(b), but after "evaluat[ing] the evidence they felt they could marshal," they "determined the facts did not support filing a motion to suppress under Article 31(b)." (Findings of Fact and Conclusions of Law at 7.) This was, at least, a legal consideration, but the only consideration that could be deemed "tactical" is that in deciding where to focus their efforts, counsel believed that a motion under M.R.E. 514 was more consistent with their client's self-assessment that he was the actual victim in the case. Still, counsel frequently argue alternative theories of admissibility or inadmissibility of evidence before military judges and there was nothing for them to lose, at least tactically, by filing a motion under Article 31(b) in the alternative to their M.R.E. 514 motion.

2. *Whether failure to seek suppression was a reasonable strategic decision*

The decision not to file a motion to suppress under Article 31(b) was "strategic," as the Government urges, in the sense that it was conscious and, ultimately, theirs to make, not Appellant's. *See* ABA CRIMINAL JUSTICE STANDARDS FOR THE DEFENSE FUNCTION, Standard 4-5.2 (4th ed. 2015) ("Strategic and tactical decisions should be made by defense counsel, after consultation with the client where feasible and appropriate. Such decisions include . . . what motions and objections should be made . . . ."). As far as whether it was reasonable, we agree that there is no professional norm to file every possible motion, however remote its chances of success. Counsel have limited time and resources and must use their legal judgment to decide what motions are viable and worth pursuing. But when the decision not to pursue a motion is premised on an assessment of its lack of merit, the question of whether that decision was reasonable turns on our legal conclusion of whether the motion had a reasonable probability of success. *Harpole*, 77 M.J. at 236. We thus turn to the merits of the motion.

3. *Whether there is a reasonable probability that such a motion would have succeeded*

Based on evidence received during the hearing, the military judge concluded that a motion to suppress under Article 31(b) would not have succeeded because YN1 HN had no law enforcement or disciplinary purpose and was, instead, acting solely in her role as a victim advocate. The evidence supports this conclusion and we agree.

Although YN1 HN was senior to Appellant, she was not in his direct chain of command, so there is no presumption that she was acting in a law enforcement or disciplinary capacity. Assessing the remaining facts and circumstances at the time of the interview, we conclude that YN1 HN was neither acting nor reasonably could be considered to be acting in an official law enforcement or disciplinary capacity.

First, YN1 HN testified at the hearing that she had no role in any law enforcement or disciplinary inquiry, was not attempting to gather information for any such inquiry, and that her only purpose in speaking with Appellant was as a victim advocate. The hearing officer found her credible, that she viewed her role exclusively as a victim advocate, that she had not been directed to gather evidence, and that she was not engaged in "some type of self-directed law enforcement or disciplinary investigation . . . ." (Findings of Fact and Conclusions of Law at 8.) The subjective prong is thus met: YN1 HN's purpose was only to receive Appellant's report and assist him in her role as a victim advocate; she had no dual purpose to gather evidence for a law enforcement or disciplinary inquiry.

Second, the military judge's factual finding that YN1 HN asked only limited questions narrows our analytical aperture considerably and supports the conclusion of her singular purpose. YN1 HN asked four questions: (1) while Appellant and SNBM SC stood outside YN1 HN's berthing space, she asked Appellant what he wanted to talk about; (2) once in the lounge, she again asked Appellant what he wanted to talk about; (3) she asked whether Appellant was comfortable speaking with her in the presence of SNBM SC; and (4) she interrupted Appellant's recitation of events to ask what he was doing in female berthing, but immediately gestured to convey "never mind," and Appellant continued his narrative without responding.

To reiterate, this is a case-by-case determination. It would be feasible for a victim advocate, particularly one within the same command and relatively senior to the person being questioned, to stray from her role as a victim advocate and ask questions that could only have a law enforcement or disciplinary purpose, or at least reasonably be considered as such. YN1 HN's question about what Appellant was doing in female berthing approached, if not crossed, this line. But, the military judge found, she immediately retracted the question before Appellant

could answer and it did not elicit an incriminating response. Her retraction only further demonstrates her awareness of her role as a victim advocate: not to develop information for a law enforcement purpose, but instead to allow him to relate his narrative and support him as a victim.

Turning, finally, to the objective prong, a reasonable person could not, under the circumstances of this case, have considered YN1 HN to be acting in a law enforcement or disciplinary capacity. Appellant sought her out as a victim advocate and told her he wished to speak to her as a victim advocate. YN1 HN's actions throughout the interview were objectively consistent with taking a self-identified victim's report in her role as a victim advocate and inconsistent with a law enforcement or disciplinary inquiry. She did not prepare for the interview in any way; ensured Appellant was comfortable making his report in front of a third party, which would not be a consideration for a law enforcement inquiry; informed Appellant that it would be an unrestricted report and she would have to notify the chain of command, to which he agreed; asked only broad questions to allow him to tell his story, immediately retracting the one question that went beyond that; did not record the interview, take any notes, or otherwise memorialize the interview; did not ask either Appellant or SNBM SC to make a written statement. To a reasonable observer, YN1 HN was merely doing what Appellant asked her to do: receive his report that he had been sexually assaulted in her role as a victim advocate. Weighing all the circumstances, YN1 HN's receipt of Appellant's report could not reasonably be considered as participation in a law enforcement or disciplinary inquiry.

We thus conclude that YN1 HN did not "interrogate, or request any statement from" Appellant within the meaning of Article 31(b), so a motion to suppress on that basis would not have succeeded. As such, Appellant has failed to show either deficient performance or prejudice from his counsel's decision not to pursue such a motion. This moots the CAAF's final question: whether there is a reasonable probability that the members' findings would have been different had YN1 HN's testimony been suppressed.

**Decision**

We determine that the findings and sentence are correct in law and fact and, on the basis of the entire record, should be approved. Accordingly, the findings of guilty and the sentence, as approved below, are affirmed.

Chief Judge McCLELLAND and Judge JUDGE concur.



For the Court,


Sarah P. Valdes
Clerk of the Court